Parker *v.* Seeley.

CORTLANDT PARKER et al., executors, &c., of RICHARD W. STITES, deceased,

*v.*

ELIZABETH W. SEELEY, RICHARD WAYNE STITES et al.

[Filed September 20th, 1897.]

1. Where a widow is entitled to an annuity under her husband's will, her estate is entitled, on her death, to that part of the annuity for the year in which she died that had accrued at the time of her death, and not to the entire annuity for the year.

2. Where a fund is held in trust for one person for life and for another in remainder, and the trustees realize a profit on real estate bought under foreclosure of a mortgage in which the fund is invested, the profits are to be apportioned between the life tenant and remainderman in the proportion which the principal represented by the investment bears to the interest which was in arrears, and also represented by the investment.

3. Where a will contemplates an actual division of the estate by trustees and payment to the tenants in common in money, a power of sale is to be inferred.

4. Testator gave certain property and furniture, &c., to his son-in-law and grandson in trust for his wife for life, and on her death he gave his son "the right to purchase (not for speculation) the said dwelling-house in E. street and a part or portion of the said lot upon which said house stands, for $8,000," and provided that if his son should elect to purchase such property it should be vested in testator's trustees, in trust for his son for life, and after his son's death to his lawful heirs. He also directed that his son should have five years after the death of the widow to pay his two sisters each their third part of the $8,000, but the time when the son's right to purchase was to be exercised was not mentioned or limited, except that it was to take effect after the widow's death; nor was any particular mode indicated in which it was to be exercised. The property which the son was given the right to buy was worth much more than $8,000. At the time of the widow's death the son was on his deathbed and died eleven days afterwards; and at no time after her death was he able to attend to any business requiring any continued effort, either mental or physical.—*Held*, that the son's option to buy was not one which could be exercised only by a written declaration, and where he had fully made up his mind to accept the gift on the terms named, and the trustees knew of such fact and could have compelled him at any time to declare himself one way or the other, the option was not lost (though no formal declaration, either oral or written, was ever made by the son, directly, to either of the trustees, of his intention to purchase on the terms named), and his son and only heir had the right to take the property on payment of the $8,000.

Final hearing on pleadings and proofs.

*Mr. Cortlandt Parker, Jr.*, for the complainants.

*Mr. George T. Werts*, for the defendant Richard Wayne Stites.

PITNEY, V. C.

The object of this bill is to obtain the opinion of the court upon the construction of the will of the late Richard W. Stites, of Morristown, New Jersey, and for instruction to the executors as to certain questions arising in the course of the administration of the estate and the settlement of their accounts.

It is a friendly suit and made necessary by the infancy of one of the parties in interest.

The testator died on the 2d of July, 1877, leaving three children, Elizabeth W. Parker (wife of Cortlandt Parker), Frances B. Seeley (wife of ———— Seeley) and Richard M. Stites, each

of them being married and having children, and also a widow, Elizabeth C. Stites, who survived him and died on the 29th of February, 1896. His daughter, Mrs. Seeley, died on the 11th day of January, 1889, seven years before her mother. The son, Richard M. Stites, died on the 11th of March, 1896, eleven days after his mother; and Mrs. Parker is still living.

For many years before and at the time of his death, the testator resided on his homestead property, situate on Elm street, in Morristown, and his son, Richard, who was married in the father's lifetime, lived with him. The homestead consisted of a tract one hundred and nineteen feet on Elm street and seven hundred and fifty-two feet deep from the middle of the street. It is bounded on the northeast by the lot of S. H. Little, formerly owned by W. C. Baker, and on the southwest by the lot of Mr. Bushnell, and has no frontage on any street except Elm. The dwelling occupies a little less than one-third of the frontage and stands in about the centre of the lot, leaving a vacant lot on each side.

The will, probably a holograph, executed in 1873, after appointing testator's son-in-law, Cortlandt Parker, and grandson, Richard Wayne Parker, now known as Wayne Parker, his executors, proceeded to give unto them his estate, real and personal, in trust:

"*First.* To hold the lot and dwelling-house in Elm street, Morristown, in which I now live, for sole use, occupation or income of my faithful and devoted wife, Elizabeth C. Stiles, with all of the furniture, plate, carriage & *cet.*, free of all charge or rent, for and during the term of her natural life. Also, I give and devise to my said wife, E. C. Stites, during her said life, the sum of one thousand eight hundred dollars per annum, to be paid her by my said executors and trustees, when and in such sums as she may desire. The above to be in lieu of dower. My estate in general to make all needful repairs. My son and wife to pay taxes and insure to amount of seven thousand dollars upon the house, *i. e.*, if he (my son) elects to purchase said house. Upon the death of my said wife, E. C. S. [died February 29th, 1896], I give to my son, R. M. Stites [died March 11th, 1896], the right to purchase (not for speculation) the said dwelling-house in Elm street and a part or portion of the said lot upon which said house stands, for eight thousand dollars, which part or portion of the said land will consist of eighty feet front upon Elm street, beginning at the corner-post in the lane between the land owned lately by Wm. C. Baker

Parker *v.* Seeley.

[now S. H. Little] and myself, and running back in depth three hundred and sixty feet. The above eight thousand dollars to include all of the furniture except the silver.

"If my son, R. M. Stites, shall elect to purchase said lot and dwelling in Elm street, then the said lot shall be vested in my trustees, Cortlandt Parker and R. W. Parker, and the survivor of them, in trust to and for the use, benefit and behoof of my son, Richd. M. Stites, during his life, and after his death to his lawful heirs, Richard W. Stites [defendant] and Montgomery Stites [died in testator's lifetime]. My son, R. M. Stites, may have five years after the death of my wife to pay his two sisters, Mrs. Parker [defendant] and Mrs. Seeley [died 1889], each their third part of the said eight thousand dollars. Lawful interest to be paid annually on the said debt by him. To help to meet this debt, I advise my executors and trustees to lay aside out of my son's portion at least two or three hundred dollars annually as a sinking fund.

"If necessary, my executors and trustees are authorized to pay to the trustees of Mrs. E. W. Parker and Mrs. F. B. Seeley, the two-third part of the said debt, *i. e.*, five thousand three hundred and thirty-three dollars, out of the share held by the said trustees for him [son, R. M. Stites] and his children.

"If my son shall die without lawful heirs, or if after his death his two sons, Richard and Montgomery, shall die before the age of twenty-one years, then said house and lot shall pass over to his sisters and their heirs. If my daughter Mrs. F. B. Seeley shall ever require a home, then my son, Richard, and his trustees, shall allow her to occupy a part of the said house, free of charge, so long as she remains a widow.

"The residue of my estate, real and personal, I give and devise to my son-in-law, Cortlandt Parker, and grandson, Richard W. Parker, and the survivor of them, in trust to and for the use, benefit and behoof of my three children, Mrs. E. W. Parker, Mrs. F. B. Seeley and Richard M. Stites, share and share alike, to them during their life, so that they (my said children) will receive, possess and enjoy from my said trustees the income and profits of their respective share, each one to his or her own separate use, and after their death to their heirs forever. My grandsons, R. W. Stites and Montgomery Stites, not to have control over their respective property before each shall arrive at the age of twenty-five, and enter, if health allows, upon some way of earning an honest livelihood."

Testator left a personal estate amounting to about $80,000, which has somewhat increased in the hands of the trustees.

Four questions are submitted :

*First.* As the testator died in July, 1877, and the annuity to the widow commenced at that date, and she died before the end of the current year, counting from July to July, viz., February 29th, 1896, whether she is entitled to the whole of that year's annuity, or only to that part of it which had accrued up to the

Parker *v.* Seeley.

date of her death, the balance being needed to pay her funeral expenses, &c.

I regret that I can find no authority for giving her any more than the amount that had accrued up to the time of her death.

*Second.* The next question arises between tenants for life and remaindermen as to the disposition of extra profits to be realized upon real estate bought in under foreclosure of mortgages and held by the executors. From this source it is expected that there will be a profit, after paying expenses, restoring the principal sum and paying all arrears of interest.

It will be observed that the real estate was purchased with the funds of the estate, consisting partly of principal and partly of interest, the principal belonging to the remainderman and the interest to the tenant for life.

This subject was dealt with in the case of a loss arising under such circumstances in the case of *Hagan* v. *Platt, 3 Dick. Ch. Rep. 206,* and the doctrine there laid down was followed and applied by the ordinary in *Tuttle's Case, 4 Dick. Ch. Rep. 262.* The rule so established is that, in case of a loss, the deficiency is to be divided between the tenant for life and remainderman in the proportion which the principal represented by the investment bears to the interest which was in arrear and also represented by the investment. And it seems to me that the same principle applies to the case where a profit instead of a loss arises. The authorities and reasoning in *Hagan* v. *Platt* and *Tuttle's Case, supra,* so far as I have observed, had not been presented to the court in any previous reported case. Chancellor Runyon had a similar case before him in *Parker* v. *Johnson, 10 Stew. Eq. 366.* There was there a profit of $1,700 arising under circumstances precisely similar to those before the court, and he ordered the surplus to be retained, and not applied either to principal or interest, until it appeared whether or not there might not be a loss on some of the other investments held under the same trust, and says : " The trustee in this case is to keep the fund invested, and the tenant for life is entitled to the interest. It is clearly the duty of the trustee to apply the profits of one investment to make up the losses on the other."

It thus clearly appears that the precise question now under consideration was not presented to the mind of the chancellor, nor were the authorities cited before him. The third proposition decided in *Outcalt* v. *Appleby, 9 Stew. Eq. 73,* has no application here, for the reason that the unproductive property there held was a part of the original estate. The consideration which seems to control is that the property purchased represents both principal and interest, and its growth in value is due to both sources.

I shall advise that at the final settlement of the estate at the end of the trust, the surplus, if any, arising from the purchase of property under foreclosure and resale thereof, shall be divided according to the rule laid down in *Hagan* v. *Platt* and *Tuttle's Case.*

*Third.* The next question is as to the power of sale of the executors arising under the disposition of the residue. That residue, consisting of real and personal property, is given

" in trust for the use, benefit and behoof of my three children, Mrs. E. W. P., Mrs. F. B. S. and R. M. S., share and share alike, to them during their life, so that they will receive, possess and enjoy from my said trustees the income and profits of their respective shares, each one to his or her own separate use, and after their death to their heirs forever."

The plain rule is that if the will contemplates an actual division of the estate by the trustees and payment to the tenants in common in money, that a power of sale of land is to be inferred. On that subject I cite *Vanness* v. *Jacobus, 2 C. E. Gr. 153,* by Chancellor Green; *Wurts* v. *Page, 4 C. E. Gr. 365* (at *p. 375*), by Chancellor Zabriskie; *Haggerty* v. *Lanterman, 3 Stew. Eq. 37,* by Chancellor Runyon; *Belcher* v. *Belcher, 11 Stew. Eq. 126,* also by Chancellor Runyon.

It is probable that a close application of this rule to the case in hand would give the executors a power of sale. But I do not consider it necessary or proper in this case to determine that question, for the reason that it is perfectly clear that the real estate which will fall into the residue in this case is incapable of division and must be sold, and that the interests of the parties

require that it should be sold and all parties are before the court, so that the property may be sold by a master and have the approval of the court, with very slight additional expense, and with the result that the title passed will be above suspicion.

I will advise a sale by a master.

*Fourth.* The next question arises under the gift to testator's son, Richard M. Stites, usually called Colonel Stites, of

"the right to purchase (not for speculation) the said dwelling-house in Elm street, and a part or portion of the said lot upon which said house stands, for eight thousand dollars, which part or portion will consist of eighty feet front on Elm street, beginning at the corner post in the lane between Baker's [now Little's] land and myself, running back in depth three hundred and sixty feet."

It will be observed here that this is a gift of the "right to purchase," and the time when the right is to be exercised is not mentioned or limited, except that it is not to take effect until the death of the testator's wife, nor is any particular mode indicated in which it is to be exercised.

The facts are that no formal declaration, either oral or in writing, was ever made by Richard M. Stites, directly, to either of the trustees of his intention to take the property at the price named. The matter had been the subject of conversation between Mr. Wayne Parker and his Uncle Richard, in the lifetime of the latter's mother. Mr. Parker swears that the matter of the exercise by Richard of his right of purchase was spoken of between them about the year 1891 or 1892, on the occasion of an accident happening to his grandmother. The question of repairs was under discussion, and as to whether the executors ought to make certain repairs out of the funds of the estate, and Mr. Parker said to Colonel Stites, "You may be the person interested. I do not know, for you have never told me whether you expected to take the house;" and that his uncle answered, "That question does not arise until after mother's death." That nothing more was said after that remark. But Mr. Parker is in doubt as to whether he said to his uncle on that occasion that "he supposed he would take the house," or, "he didn't know whether he would take the house or not;" but he does remember

that he said to his uncle that he had never told him what he intended to do upon the subject.

Colonel Stites was an invalid for several years before he died, and at the time of his mother's death was on his deathbed, from which he never arose. His attending physician swears that at that time, and for three or four days after her death, he was in a very weak state; that he rallied for three or four days, about the 5th, 6th or 7th of March, and then began to sink, dying on the 11th; that neither he nor his family, however, were aware of his approaching dissolution. At the time of his mother's death, his sister, Mrs. Parker, was also very ill, and he was enabled, by the free use of stimulants, to be propped up in bed and write her a pencil letter on the occasion. But he was entirely unable to attend to any business requiring any continued effort, either mental or physical.

The property in question, as has been stated, had about one hundred and nineteen feet front on Elm street, with seven hundred and fifty-two feet depth from the centre of the street, and about seven hundred and twenty feet from the side of the street, and the house stood in about the centre of the lot, leaving a passageway of about forty feet on each side. It was bounded on one side by land of Mr. S. H. Little, formerly owned by W. C. Baker, and on the other side by the residence of Mr. Bushnell. By the terms of the will the eighty feet, including the house, the option to purchase which was given to the colonel, was to be taken on the side next to Mr. Little, and the depth, three hundred and sixty feet, was just about one-half of the depth of the lot, leaving a strip of about thirty-nine feet on the side next to Bushnell, leading to a rear lot one hundred and nineteen feet by about three hundred and sixty feet in size, which had no frontage on or connection with any street except Elm street.

On the day of the funeral, and after the burial of the elder Mrs. Stites, Mrs. Louise Stites, wife of the colonel, had a conversation with her brother-in-law, Wayne Parker, in the house, in which she swears that she informed him that the colonel had determined to take the property on the terms of the will. Her

husband had previously told her that he intended to have the vacant lot on the side next to Bushnell.  Whether he intended to have that in addition to the amount mentioned in the will, and thus control the whole front, or whether he intended to effect an exchange with the trustees and take his eighty feet from the side next to Bushnell, giving to the trustees the thirty-nine feet next to Little, does not clearly appear.  But it does appear that Mr. Wayne Parker, who was the acting trustee, desired to have the passageway of thirty-nine feet reserved by the will to go with the rear lot, to be taken from the side next to Mr. Little.

**Mrs.** Stites' account of the interview with her brother-in-law, after the funeral, is this :

[Here follows a statement of the evidence.]

From this conversation, I infer that there was no doubt in the mind of the acting trustee, Mr. Wayne Parker, from the conversation that occurred between him and his Aunt Louise—in fact, the considerable value of the lot over the price named was of itself an assurance—that his Uncle Richard had fully determined to exercise his option under the will ; and the only matter left for discussion was from which side of the lot the eighty feet should be taken.  And that, surely, was a matter of business which required some discussion and arrangement, for which Colonel Stites was entirely unfit at that moment.

On the Tuesday, March 10th—as Colonel Stites died on Wednesday, March 11th—he had a talk with his wife, and said that as Wayne would be home from Washington on Saturday, he would arrange for him to come up and they would settle the whole matter about the lot which he was to take.

The proof is abundant by Mrs. Stites and the son Richard Wayne Stites that he had fully determined to exercise the option under the will, and that the designated house and lot is worth much more than $8,000.

It is urged by the executors, acting in the interest of the *cestuis que trust*, that under these circumstances the option is lost and could not be exercised by the grandson, who is the sole heir-at-law of Richard M. Stites, and devisee of his grandfather

under the will.   There is no doubt—it was admitted—that the grandson had declared his desire to have the property at the price named.   The ground taken is that it was an option personal with the son Richard M. Stites, and could be exercised only by a written declaration which bound him to purchase at the price named, and that not having been exercised in his lifetime, it fails.

I am unable to take that view.   Here was a gift to the son of a valuable right, to be exercised at the death of his mother, the tenant for life.   The testator himself did not limit the time or the manner in which it should be exercised.   The whole thing was a family arrangement.   The executors and trustees were the son-in-law and grandson of the testator, and brother-in-law and nephew of the beneficiary.   It was not a case for the imposition by the testator of any special terms, and time was not declared to be of the essence of the gift.   Nor is there anything in the circumstances which requires that this court should declare time to be of the essence of the gift or *quasi*-contract. The strictest rule would at least give a reasonable time to exercise the option, and equity would relieve a party entitled to the right from the effect of failure to exercise it by reason of physical inability.   Here the beneficiary had fully made up his mind to accept the gift upon the terms named, but was prevented from exercising it in a formal manner by disease and death.

There never was any difficulty at any time on the part of the trustees in compelling him to declare himself one way or the other in a conclusive manner.   Either of them could have applied to him in person and asked him to say in writing what he proposed to do.   Mr. Wayne Parker could, after the funeral, have prepared two papers, two lines each, one saying, " I accept the option to purchase under my father's will," the other, " I decline to accept the option to purchase under my father's will," taken them to his Uncle Richard, sick as he was, and asked him which he desired to do, and he could have signed one or the other in two minutes.

And I cannot for a moment doubt but that if he had been

aware of his uncle's critical condition he would have done so cheerfully.

He certainly knew, from what his aunt said to him, what his Uncle Richard's mind was, and it is clear that the only ground for postponing immediate action was the matter of negotiating as to which side of the dwelling the forty feet entrance to the rear lot should be left. That was a matter which required some negotiation and mental effort, and was very properly postponed, in the hope that his Uncle Richard would soon be in a condition to discuss it.

Looking at the verbiage and frame of the will, I cannot think that the testator intended or expected that the right of his son to the house and lot in question should depend upon such a slender tenure as the trustees feel constrained to contend for here. He did not, as I read the will, have in mind that his son should bear to his son-in-law and grandson, acting as trustees, the relation of a party holding a written option to purchase land, to be exercised only according to the letter of a contract and avoided by a failure to strictly fulfill certain specified conditions. In other words, he did not expect the parties would stand at arms' length. In my judgment, he contemplated a certain state of mind on the part of his son, to be communicated in conversation to the trustees named in his will, who, as trustees for the son as well as his relatives and personal friends, would do what was necessary to carry out his will. It was evidently his expectation and wish that his widow and son should live together in the homestead during her lifetime; that his son and family should continue to occupy that homestead after her death, during his son's lifetime, with the privilege of a home for his daughter Frances if she needed it. At the death of his son he wished it to go to his grandsons upon their attaining twenty-five years of age, all upon condition that the son should consent that the trustees should take $5,333 out of his share of the personal estate and add it to the shares of his sisters. This has all been accomplished up to the death of the son. The question of the payment of taxes and insurance was a matter entirely between the mother and son, and was, presumably, settled amicably

between them. And so with regard to Mrs. Seeley's right. It never came into existence because she did not survive her mother, and so has no place here.

The son, immediately upon his mother's death, was ready to give the requisite consent to the depletion of his share when required, and occupied the house until he died. It seems to me that it would be a harsh construction of the will, and going contrary to the wishes of the testator, to say that the grandson may not now accept his grandfather's gift by formally acceding to the terms imposed.

It seems to me that the case differs little, if any, from those dealt with in *Skillman* v. *Van Pelt, Sax. 511,* and *Yawger* v. *Yawger, 10 Stew. Eq. 216.*

In the first, the devise was

"to my sons, Abraham and James, my farm whereon I now live, to them, their heirs and assigns forever, to be equally divided between them, provided they or their heirs shall pay or cause to be paid to my executors, hereinafter named, the sum of thirty-five hundred dollars, within eighteen months after my decease, which said sum of money is to be paid by them equally, each one-half,"

and Abraham (one of the devisees) and a stranger were appointed executors with power of sale. After the testator's death, October 31st, 1820, the executors proved the will, and the devisees entered and took possession of the premises, and on the 25th of November, 1820, made partition thereof between them by mutual releases. It was held that under this will the devisees took an estate in fee-simple in the devised premises, charged with the payment of $1,750 each, and that "the payment of this sum was not a condition, on the breach of which the right vested in the executors to sell; they could assert their claim under the will only by suit or bill."

In *Yawger* v. *Yawger,* the testator devised to his son John C. a farm of one hundred and three acres, by his allowing and paying for the same the price of $80 per acre. The testator died September 11th, 1882, and his son John C., October 6th, following. The learned vice-chancellor says: "It was alleged that while John C., in his lifetime, did not reject the provisions of

---

Parker v. Seeley.

---

the will in his behalf, he did not accept them.   In other words, he made no positive election.   It was suggested that, because John did not in some positive way signify his acceptance of the devise of the land and the bequest of the legacy, the title never descended to him, but was, by force of law, cast upon the heirs-at-law."   And further on : " The devise and the legacy to John were beneficial to him.   He must, therefore, be presumed to have accepted them.   A gift imports a benefit, and an assumption to take a benefit may well be presumed."

It is true that we have not here, as in those cases, a direct devise to the son subject to the payment to the sisters, but I think it is, in substance, the same, for in the cases cited the testator could not impose upon the devisees a gift subject to the payment of a fixed sum without their consent.   The consent in the two cases cited was quite as essential and requisite as here. And in this case, as in those cited, the payment of the price is not a condition precedent to the vesting of the title.   All that is necessary to vest the title is that the devisee shall accept the devise upon the terms named.   The trustees hold in their hands the money to pay the price named.

An instructive case in the same direction is *Merrill* v. *Emery*, *10 Pick. 507*, decided by Chief-Justice Shaw.   The testator in that case gave his wife certain personal property absolutely, and the use of his household furniture and pew in church for life—

"the foregoing bequests being subject to the following conditions, viz., that my said wife shall relinquish all her right of dower in my estate, and provided also that she educate and bring up my granddaughter, Mary L. Richards, until she arrive at the age of eighteen years, or is married, as the case may be."

On the evening succeeding his funeral, his wife sickened, and died on the seventh day from his death, without ever having expressly, by writing or other·proceeding in the probate court or elsewhere, waived the provision made for her in the will ; nor did she ever claim dower.   The value of the bequests to the widow was greater than all the real estate of the testator.   The action was by the administrator of the widow against the executor of the will, and it was held that she was entitled to recover

the personalty bequeathed to her.    The learned chief-justice, in support of his opinion, uses this language:

" One of the conditions was, that the legatee should relinquish her right of dower in the estate of the testator.    We think it would be a forced construction of the will, to construe this a condition precedent, in the manner contended for.    It did not imply that the widow should, by any express and formal act, release her dower; it would be a sufficient compliance that she made no claim, but tacitly waived her right.    The plain intent was that she was not to have the provision in the will and also her dower; and the same construction would have been put upon this bequest, by force of the statute, had the will contained no such condition.    In such case a widow has a reasonable time to make her election, and unless she elects to claim her dower, her right to the provision under the will is not defeated or suspended.    In the present case it is manifest that the widow did no act in her lifetime denoting any intention to claim her dower, and certainly no unreasonable time elapsed, within which she could make her election.

" But there is another view of the subject, which is this, whether, where a personal right depends *upon an election, and no express election is shown, nor any positive act or declaration, manifesting such election, an election is not to be presumed from the circumstances, and we think it may be.*

" The question then is, what was the widow's presumed election; to determine which, it becomes necessary to look into the facts.    It appears by a reference to the inventory, which is now made part of the case, that the whole of the testator's real estate was not equal in value to the provision in the will.    It is manifest, therefore, that she could not, without acting greatly against her interest, elect to take one-third of this real estate for her life, the provision in the will being obviously so much more beneficial.    *The presumption of law therefore is clear, that she must have elected the provision in preference to her dower.*    The first condition therefore does not stand in the way of the plaintiff's recovery.

" The other condition was that the legatee should educate and

bring up the testator's granddaughter. This is clearly a condition subsequent. It was to be performed for a time which might, and probably would, continue long after the legacy was to vest. The defendant objects that it was not complied with. To this there are two answers depending upon the force of the term *educate and bring up*. If they imply personal parental care, then the duty terminates with her own life and the condition was performed. She did educate and bring up the granddaughter so long as she lived, though it was indeed for a very short period. Besides, in the case of a condition subsequent, the act of God excuses non-performance. But if ' to educate and bring up' means to furnish subsistence to the granddaughter, then the condition was a mere charge on the legacy and it might be performed by the personal representative, and would not prevent the legacy from vesting. We think that a personal care was intended, and consequently that by the death of the legatee the legacy became discharged of the condition."

This reasoning seems to me to apply with force to the case in hand.

The line of authorities relied upon by the counsel of the trustees, namely, *English* v. *English's Executors, 2 Gr. Ch. 504; Baldwin* v. *Vreeland, 16 Stew. Eq. 446; Young* v. *Young, 6 Dick. Ch. Rep. 491,* seem to me to have little bearing upon the present case, and what little they have is against rather than for the position of the trustees.

In *English* v. *English's Executors,* the question was whether a widow, who had a vested estate in dower in land, had lost that estate by electing to take a bequest of money made expressly in lieu of dower. It was, in fact, a matter of a choice between two conflicting claims. Certain acts and doings were relied upon as amounting to a binding election to accept the legacy and renounce her dower. The much-quoted language of Chancellor Vroom (at *pp. 508, 509, 510*) applies to the case of a party choosing between two conflicting claims, and follows *Dillon* v. *Parker, 1 Swanst. 359* (at *p. 382*), and it was held that by the conduct in question in *English* v. *English's Executors* the widow had not finally determined to accept the legacy in lieu of her dower.

This case was followed in *Young* v. *Young, 6 Dick. Ch. Rep. 491,* where the question was of the same nature, though not arising out of a right of dower, and was in effect a choice between two inconsistent claims. The principle established in such cases is thus stated by Chancellor Vroom (*2 Gr. Ch. 509, 510*): " What acts of acceptance or acquiescence are sufficient to constitute an election cannot be designated with sufficient precision to justify a general rule. Each case, as it occurs, must be governed by its own peculiar circumstances. The general questions are whether the parties acting or acquiescing were cognizant of their rights, whether they intended to make an election, whether they can restore the individuals affected by their claim to the same situation as if the acts had never been performed, or whether these inquiries are precluded by lapse of time. * * * There must be some decisive act of the party, with knowledge of her situation and rights, to determine the election, or there must be an intentional acquiescence in such acts of others as are not only inconsistent with her claim of dower, but render it impossible for her to assert her claim without prejudice to the rights of innocent persons."

There is in the present case no question of choice between inconsistent claims, but merely one of the acceptance of a gift upon terms. And if Colonel Stites, or his son Richard, the present defendant, had said and done certain equivocal and indeterminate things indicating an intention not to accept the devise upon the terms mentioned, those cases would be authority for the position that they might, in the absence of irretrievable action by the parties adversely interested, retract what they had said and done and finally accede to the terms and accept the gift.

In *Baldwin* v. *Vreeland, 16 Stew. Eq. 446,* there was a devise of land to a trustee, with power and direction to sell and divide the proceeds among several persons named. The beneficiaries united in an agreement to sell the premises at a price named, which, however, was never carried out. Subsequently one of the beneficiaries sold and conveyed his interest in the land to an outside party, and afterwards the executors, at the request of the other beneficiaries, proposed to exercise the power of sale,

and the question was whether the uncompleted agreement entered into by the beneficiaries to sell was such an expression of an intention to take the land itself instead of the proceeds of its sale as destroyed the power of sale, and it was held that it was not. Clearly, the decision does not apply here.

Stress was laid at the argument upon the parenthetical expression, " but not for speculation," found in the devise in question, and it was argued that the giving the unfettered title in fee to the grandson will run counter to the expressed wish of the testator. But I think this argument misconstrues the force and purpose of that expression. It was not relied upon by the testator to limit the estate given to his son. That was done by vesting it in the trustee for the life of the son and until the grandson attained twenty-five years of age. After the death of his son and the arrival of his grandson at the age of twenty-five years, it was his clearly-expressed will that the grandson should have an unfettered fee-simple. The true office of the expression in question, as I read the will, was to express one of the reasons which influenced the testator in making this provision for his son and grandson, and for limiting the son's estate therein.

I will advise a decree in accordance with the foregoing views.