FRANCIS E. LARKIN et al.

*v.*

JAMES H. WIKOFF et al., trustees, &c.

[Decided February 6th, 1909.]

1. A church property was conveyed to trustees to be used for gospel preaching and religious services free to all the people of the neighborhood; the several Christian denominations, Presbyterian, Methodist, Baptist and Reformed Dutch, to be accorded equal rights in preaching alternately on the Sabbath. The donor also placed in the hands of the trustees a sum of money to be invested and the income to be appropriated to keeping the church edifice in repair and to provide a fund for the payment of such pastors as might be employed from time to time to conduct the services in the church. Power was given to the trustees to decide upon the discontinuance of the services so provided for whenever it should seem clearly expedient so to do, and to sell the church property and hold the proceeds of sale together with the donated fund upon a certain other trust. The trustees resolved that it was expedient to discontinue and abandon the use of the church for gospel preaching and religious services for certain reasons which they deemed sufficient, they being by the deed of trust constituted the judges and fully authorized to decide the question. Certain residents of the immediate vicinity of the church filed the bill in this cause, alleging that the proposed sale was in disregard of the trust created by the donor, and they prayed for an injunction restrain-

ing the trustees from selling or conveying any part of the church property.—*Held* (1) that the bill should have been filed on behalf of the complainants and all others similarly interested in the subject-matter of the suit; and that the attorney-general, representing the public, should have been joined with them, in which case the pleading would be a bill and information, or, the attorney-general should have been made a party defendant to the bill; but the pastors who conduct the services are neither *cestuis que trust* nor trustees under the deed, and, not being necessary parties, were rightly omitted from the bill; (2) an amendment may be allowed upon the hearing so as to make the complainants sue on behalf of themselves and the rest of the class interested with them; and the attorney-general may now be charged as a defendant and brought in by process; (3) the case being disposed of on the merits as between the present parties to the record, if the attorney-general should be satisfied that a right conclusion has been reached he may file a formal answer and submit to the judgment of the court; if he should file a litigious pleading against the defendant trustees the case will be opened to take additional proofs, in which event the whole question at issue will be open; (4) the doctrine of *cy pres*, that is, the doctrine that a fund for charity impossible of application according to the intention of the donor shall be applied as nearly as may be according to his intention, obtains in this state; but the doctrine cannot be applied where the donor himself has directed what disposition shall be made of the trust property in the event of the failure of the charitable use to which he directed it should be devoted; (5) where power is given to trustees to do a particular thing, they being constituted the judges and fully authorized to decide the matter, the court has no jurisdiction to command them as to the exercise of that power, provided their conduct be *bona fide* in all respects.

2. If reasonable grounds exist for coming into court to obtain the construction of the instrument creating a trust, the practice is to allow the costs and expenses, as respects all parties, and as between solicitor and client, out of the trust funds; and this, whether the instrument creating the trust be a will or a deed.

On final hearing. On bill, answer, replication and proofs.

The bill alleges that the complainants reside in the immediate vicinity of the Cedar Grove church in the township of Princeton, and that they and their families are members of and contribute to the support and maintenance of the respective churches and denominations named in the deed of trust made by the late Paul Tulane to the trustees of the First Presbyterian congregation at Princeton, on May 27th, 1876, and have been and are constant attendants at the services held in the church edifice at Cedar Grove, as well as attendants at the Sunday

school held therein on each and every succeeding Sunday. The conveyance was a grant of a tract of land, with a church edifice erected upon it, in trust, to be used for gospel preaching and religious services, free to all the people of the neighborhood; the several Christian denominations, Presbyterian, Methodist, Baptist and Reformed Dutch, to be accorded equal rights in preaching alternately on the Sabbath, according to a plan or programme to be declared and made known by the party of the second part, as nearly like the plan that had theretofore been and then was accepted and carried out by the grantor as could be; the preaching in the chapel was expected to be done chiefly by the pastors of the several denominational churches aforesaid, which were represented by families residing in the vicinity of Cedar Grove as theretofore, but thenceforth under the supervision and arrangement of the party of the second part; and in further trust that whenever thereafter the use of the chapel for the purpose aforesaid should have been necessarily abandoned or discontinued through the neglect of the people to attend upon the services, or through the failure of the several pastors to preach in the chapel, or through the waste or destruction of the building, or whenever from any cause which should seem to the trustees clearly expedient, to discontinue the plan of holding the property for such user as aforesaid, they, the trustees, being the judges and fully authorized to decide such discontinuance from all or any cause whatever, then and in such case of nonuser, abandonment, or discontinuance, the trustees should hold the land and all buildings thereon as the property of the trustees for the use of the said First Presbyterian Church of Princeton, with power to sell the same, and to convert it into money, and to hold the money arising from the sale thereof forever in fee, for the use of the said First Presbyterian Church aforesaid, of which they are the trustees, for meeting and defraying the contingent and ordinary expenses of said church and congregation. The deed of trust was duly executed and delivered and accepted by the trustees of the First Presbyterian Church of Princeton, who immediately took possession of the land and premises described therein, and entered upon the execution of said trust, and have ever since continued to act in accordance with the

terms, conditions and requirements in the deed particularly specified to be carried out and performed on their part as such trustees, so that the church edifice has from May 27th, 1876, up to the time of filing the bill, been continuously used and occupied on each and every succeeding Sabbath by the various denominations of Christian worshipers named in the deed, which religious worship was presided over and the preaching in the chapel was conducted by the pastors of the several denominational churches aforesaid. In addition to the religious services there has been held in the edifice a union Sunday school, so called, composed of the parents and scholars of the various Christian denominations residing in and around the vicinity, and which said school has been conducted regularly up to the present time with the full knowledge and consent of the trustees; that the country surrounding the church is thickly settled and that the nearest house for religious worship in the community is at a distance of three or four miles, and that it was especially in view of that fact that Mr. Tulane, in his lifetime, purchased the land and premises and conveyed it in trust to the defendants for the sole and exclusive object and purpose that the inhabitants of the community might enjoy in perpetuity the means and advantages of religious worship; and in order to further secure said object Mr. Tulane, in his lifetime, by another deed of trust, placed in the hands of the defendants, trustees, the sum of $5,000 to be by them invested in good securities and the income arising therefrom to be appropriated exclusively—*first,* to the keeping of the church edifice in proper and sufficient repairs, and *second,* to provide a fund for the payment of such pastors as might be employed from time to time to conduct the services in the church in accordance with the wishes and instructions of Mr. Tulane, as expressed by him in the two deeds of trust.

By an advertisement inserted in the *Princeton Press* newspaper on June 22d, 1907, the trustees advertised the sale on Saturday, June 29th, 1907, at the Nassau Inn, Princeton, of the premises described in the trust deed, the advertisement stating the sale would be had by virtue of the provisions of the trust deed aforesaid and by virtue of the authority of resolutions of the board of trustees passed May 22d, 1907.

The complainants charge that this attempt to sell the property is in disregard of the terms of the trust reposed in the trustees, and that they apprehend that the trustees intend to sell and convey the church edifice and lands described in the deed, and thereby the church may be closed and the complainants and the residents of the community in and about the church may be deprived of the use and the conveniences of religious services contemplated by the donor, and that the trustees intend to appropriate not only the money arising from the sale of the said premises, but also to appropriate to their own use the said sum of $5,000, which was set apart by Mr. Tulane to aid and maintain in perpetuity the services to be carried on in the church edifice, as specified in the deed of trust. They pray, among other things, that the defendants may be enjoined from selling or conveying away any part or parcel of the church property.

The defendants answered and admit the making, execution and delivery of the trust deed, and they say that while the deed was delivered to and accepted by them on May 29th, 1876, yet the donor wished to, and in fact did, personally supervise and look after the church for several years, and from the time he gave up his personal supervision (not saying when) the trustees in the deed entered upon the execution of the trust and since and up to June 29th, 1907, supervised and executed the trust strictly in accordance with the letter and spirit of the deed and the plan of the donor. They say that they believe a Sunday school of the parents and children residing in the vicinity of Cedar Grove has been held in the church edifice, but deny that the school if organized or the individual members thereof have acquired any rights in the premises; that the abandonment and sale of the church will not necessarily deprive the people of Cedar Grove, who desire it, of gospel knowledge, as there is a schoolhouse within a few rods of the church which might be available for Sunday school services; they deny that Mr. Tulane purchased the tract of land and premises and conveyed it in trust to the defendants for the sole and exclusive object and purpose in that behalf in the bill of complaint alleged to have been expressed in the deed of trust, and they assert the fact

to be that Mr. Tulane did give to them, the trustees, on or about
May 29th, 1876, the sum of $5,000 to be held by them, and to
be securely invested, and the income thereof annually to be ap-
plied in defraying the expenses of maintaining free preaching
and religious services in the chapel or church at Cedar Grove,
in paying the salary of a sexton, and the cost of fuel, and keep-
ing the house in order, and in compensating the pastors of the
several churches who are expected to preach alternately on the
Sabbath, under a plan of arrangements to be prescribed by the
trustees, following as nearly as can be the plan then observed
by Mr. Tulane; the several Christian denominations, the Presby-
terian, the Baptist, the Reformed Dutch and the Methodist con-
gregations adjoining, to be equally admitted to the use of the
preaching services under the plan to be made by the trustees, so
as to carry out what they believe to have been the wish of Mr.
Tulane in creating the trust, and as set forth in the trust deed
for the church property, which he conveyed to them, and when-
ever the church shall have ceased to be used for preaching and
holding religious services therein and shall have been sold and
abandoned for use as aforesaid, then to hold the $5,000 for the
use of the First Presbyterian Church of Princeton, to be applied
for meeting the contingent and ordinary expenses of the church
and congregation; that the defendants, trustees, received the
sum of $5,000, and used the income therefrom in accordance
with the terms of the trust; that they have advertised and it
was their purpose to dispose of the church edifice and the land
accompanying the same at public auction, but they deny that
the intended sale was in disregard of the terms of trust reposed
in the trustees, and say that their action in the abandonment
of the use of the church property for church services and the
proposed sale thereof were in strict conformity with the terms
of the trust deed, and the terms of the trust above set out; that
the defendants deny that they intended to appropriate not only
the money arising from the sale, but also the said sum of $5,000
to their own use, but assert the fact to be that on or about May
22d, 1907, at a duly convened meeting of the board of trustees
of the First Presbyterian Church at Princeton, by resolution and
in accordance with the terms of the said trusts, it was deemed

expedient to discontinue and abandon, on and after July 1st, 1907, the use of the property described in the complainants' bill, and the church edifice for gospel preaching and religious services—*first,* because the people in the neighborhood of Cedar Grove neglect to attend upon the services, and the few persons who do attend are connected with other churches in the vicinity and within easy reach of their respective churches; *second,* because the people in the vicinity of the church take little or no interest in the services or the work being done for them; *third,* because it would be a waste and perversion of the trust to longer continue preaching services at Cedar Grove, and that thereafter the church property and building be held for the use of the First Presbyterian Church at Princeton, until the same could be sold, when the proceeds therefrom should be used for meeting and defraying the contingent and ordinary expenses of said church and congregation as provided by the terms of the trust deed; and it was further determined by said resolution to sell the premises described in complainants' bill of complaint to the highest bidder at public vendue; that at the meeting of May 22d, 1907, it was determined by another resolution of said board of trustees of the First Presbyterian Church at Princeton, that inasmuch as the Cedar Grove church is to be abandoned and discontinued for preaching and the holding of religious services on the 1st day of July, 1907, for causes satisfactory to the said trustees, within the terms of said trust, that the said sum of $5,000, together with the accumulated unused income thereon, be, on and after July 1st, 1907, held for the church and congregation aforesaid and the income therefrom used and applied toward paying the contingent and ordinary expenses of said church and congregation, as provided in the terms of said trust; that the decision of the trustees to abandon and discontinue the use of the church and to sell the same and to hold the proceeds together with the said trust fund, which provided, among other purposes, for the defraying of expenses for maintaining free preaching in the Cedar Grove church, in trust for and to apply the same in paying the contingent and ordinary expenses of the First Presbyterian Church of Princeton, was only reached after careful investigation of the conditions that existed at

Cedar Grove and the exercise in absolute good faith of the best judgment of the trustees based upon the facts, who by said deed of trust were made the judges and were fully authorized to decide upon said discontinuance for reasons other than those specifically mentioned in the deed of trust, as well as those named in the answer; that for several years past the trustees have believed that the time was near approaching when it would be their duty under the terms of the trust to discontinue the use of the church at Cedar Grove for religious services because of lack of work and attendance upon the services, and it seemed that the object of the trust was no longer being obtained, yet the trustees felt that the step to discontinue the services should not be taken until they were fully persuaded that the objects of the trust were not being fulfilled, and if they have erred at all it is in not long ago discontinuing the services, and while they have believed and still believe that the trust deed fully authorizes them to decide in good faith upon the discontinuance of the preaching services and the termination of the trust for the benefit of Cedar Grove from all or any causes whatever in addition to the grounds specifically mentioned therein, and while they are not obliged under the terms of the trust to give reasons for their action, yet, in order to show the court their absolute good faith in their decision, they would say that the following are some of the circumstances which led up to their decision and the facts upon which their judgment was based: (*a*) That within the past year and a half they have received communications from the session of the First Presbyterian Church and from certain of the pastors who supply the pulpit at Cedar Grove, advising them of the conditions existing at Cedar Grove and recommending the discontinuance of the religious services as carried on under the terms of the trust; (*b*) that the community in the vicinity of Cedar Grove has changed since the establishment of the church; that Mr. Tulane, who was the son of a French Huguenot immigrant, bought the church from the Methodists to provide a convenient place of worship for his own countrymen in that community; that none of the people for whom the trust was originally established are now living at Cedar Grove, nor their descendants, so far as the defendants are able to learn; (*c*) that almost without

exception the religious people now in Cedar Grove are connected with churches in Princeton, Hopewell, Blawenburg, &c., and are in easy reach of their respective churches, the most remote being not more than four miles from a church of his own denomination; (*d*) that the services of recent years have been poorly attended, the average at a preaching service being fifteen in fair weather and at times an attendance of only four people upon said services, the people taking little or no interest in the work being done, there frequently being no one to play the organ; (*e*) the pastors who supply in turn the pulpit are agreed that the services as now carried on are not sufficiently needed or appreciated to justify their continuance, the only possible exception being the Baptist minister at Hopewell, who has some parishioners who find it more convenient to attend upon his preaching at Cedar Grove than in Hopewell; (*f*) that the abandonment and sale of the church as provided by the trust will not necessarly deprive the people of Cedar Grove who desire to attend, of gospel privileges, in fact, it is not and has not been the desire of the trustees to close the Cedar Grove church and discontinue the services, but it seemed that it was their clear and plain duty to do so under the terms of the trust and plan of the donor; that there is a schoolhouse within a few rods of the church, which might be available for Sunday school and preaching services should the people desire such work to go on; besides that it is not unlikely that in the event of a sale, the church may be bought by some denomination of Christians who would better serve the community than is done under the provisions of the trust that prevents any responsible leadership or control in the pastoral work; the plan of the donor seems to have utterly failed in the conduct of the services at Cedar Grove; (*g*) that it would be a perversion of the trust and a neglect of the defendants' duties as trustees if they longer continued the use of the trust property for the maintenance of services at Cedar Grove as provided in the trust.

The defendants admit that although the complainants may have an interest in the subject-matter of the suit, yet they say that they are not answerable alone, but as well to all other persons residing in the neighborhood of the Cedar Grove church,

and that the bill should have been filed by the complainants on behalf of themselves and all other persons residing in the neighborhood, who would come in and contribute to the expenses of the suit, and that the complainants should not be allowed to proceed without making parties the respective pastors of the Presbyterian, Methodist, Baptist and Reformed Dutch churches, which are represented by the families residing in the vicinity of and who supply the pulpit in the Cedar Grove church in accordance with the terms of the trust, the interest of whom a decree in this cause must directly and essentially affect (giving the names and addresses of the pastors), and praying to have the same benefit of this defence as if they had demurred to the bill.

*Mr. Adrian S. Appelget* and *Mr. George O. Vanderbilt,* for the complainants.

*Mr. John V. B. Wicoff,* for the defendants.

WALKER, V. C.

The right of the complainants to maintain this suit being challenged, that question will be examined before proceeding to the consideration of the cause upon its merits. Two grounds of objection are named in the answer, and for which the benefit of a demurrer is prayed, namely—*first,* that while the complainants may have an interest in the subject-matter of the suit, yet their bill should have been filed on behalf of themselves and all other persons residing in the neighborhood of the church who would come in and contribute to the expenses of the suit, and *second,* that they should not be allowed to proceed without making parties the respective pastors of the Presbyterian, Methodist, Baptist and Dutch Reformed churches, who supply the pulpit, and who, it is said, have a direct interest which may be affected by the decision of this cause. A third objection was urged upon the argument, and that is, that the attorney-general is a necessary party in this proceeding. These objections will now be considered together.

In several cases in this state bills were filed by a limited number of individuals who were interested in a charitable trust and

the rights of the parties were adjudicated without the presence of the attorney-general and without the bills having been filed on behalf of the complainants and all others who were interested with them in the subject-matter. Of this class of cases *Ludlam* v. *Higbee, 11 N. J. Eq. (3 Stock.) 342,* and *Mills* v. *Davison, 54 N. J. Eq. (9 Dick.) 659,* are examples. But in *MacKenzie* v. *Trustees of Presbytery, 67 N. J. Eq. (1 Robb.) 652,* the court of errors and appeals, speaking by Judge Green (at *p. 685*), cited *Mills* v. *Davison,* and intimated that if strict regard for practice would have made it proper that the attorney-general be a party to such suits, that all that need be said is, that the matter was passed *sub silentio,* and that such cases are not authority in point of practice either *pro* or *con.* He then went on to expressly decide the point because the standing of the complainants as suitors had been attacked by the defendants, and cited *Attorney-General* v. *Moore's Executors, 18 N. J. Eq. (3 C. E. Gr.) 256; S. C., 19 N. J. Eq. (4 C. E. Gr.) 503,* in which the procedure by an information by the attorney-general *ex relatione* was followed, and he referred to *Green* v. *Blackwell, 35 Atl. Rep. 375,* in which the procedure was pointed out as the one proper to be followed. In this case (*Green* v. *Blackwell*) Vice-Chancellor Stevens held that a citizen of the state not being a trustee or executor and not otherwise especially interested, cannot file a bill in a case in which he seeks to do nothing more than vindicate a public right, but that in cases relating to charities he may be a relator in an information filed by the attorney-general, but that the presence of the attorney-general is indispensable.

One of the latest cases in our reports in which this question is exploited is that of *Lanning* v. *Commissioners of Public Instruction, 63 N. J. Eq. (18 Dick.) 1,* in which the attorney-general was a party defendant. The bill was filed by the complainant on behalf of himself and all others similarly situated and interested in the matters exhibited in the bill, against the defendants as individuals and as commissioners of public instruction of the city of Trenton, who had succeeded a former public corporation as trustee under a will creating a trust for charitable uses, the purpose of the trust being to establish a library for the use of the teachers and pupils of the public schools, apprentices, me-

chanics and such other persons as the trustee should deem expedient and most conducive to the public good.    Chancellor Magie said (at *p. 8*) : "As this is a public trust, the attorney-general, representing the public, is a necessary party to the litigation.    The general practice seems to be that a bill of this sort in a matter of a public trust is filed by the attorney-general, either on his own motion or on the relation of some parties interested.    In this case the parties interested have presented the bill and have made the attorney-general a party defendant thereto.    No objection to this course having been made by the attorney-general, I think the proper parties are before the court, and that it is immaterial that the attorney-general is a defendant instead of a complainant.    That was the view taken by the Massachusetts supreme court in *Harvard College* v. *Society, &c., ubi supra, 3 Gray 280,* and it accords with reason."

The case of *Attorney-General* v. *Heelis, 2 S. & S. 67,* was an information and bill by the attorney-general in which ten persons were the relators on behalf of themselves and all the other tenants and occupiers of houses and other premises situate in Great Bolton subject to the rates or assessments, and entitled to the benefit of certain acts of parliament, and the defendants were the trustees under those acts.

In cases where the relator has an interest in the matter in dispute, in which case his personal complaint being joined to and incorporated with the information given to the court by the attorney-general, the pleading forms what is called an information and bill.    *Dan. Ch. Pl. & Pr.* (*6th Am. ed.*) *\*10.*

The rule is that where property affected by a trust for public purposes is in the hands of those who hold it devoted to that trust, it is the privilege of the public that the state be entitled to intervene by its officers for the purpose of asserting on behalf of the public generally the public's right and interest.    *Ibid. \*8.*

Where a bill has been filed by an individual of a numerous class in his own right, the court will generally allow an amendment to be made so as to make such individual sue on behalf of himself and the rest of the class, even on final hearing.    *Dan. Ch. Pl. & Pr. \*245.*

The *cestuis que trustent* are those for whose benefit others are seized of real or personal property. *1 Bouv. Dict. (Rawle's Rev.) 302.* The *cestui que trust* is the real, substantial and beneficial owner of an estate which is held in trust as distinguished from the trustee in whom the mere legal title is vested. *28 Am. & Eng. Encycl. L. (2d ed.) 1100.* In the case under consideration the *cestuis que trustent* are all the people of the neighborhood of the Cedar Grove church, and the trustees are the trustees of the First Presbyterian Congregation at Princeton. The pastors of the several Christian denominational churches who conduct the services at Cedar Grove are neither *cestuis que trustent* nor trustees under the Tulane deed; if they were either a decree could not be pronounced in this cause without their presence before the court. As it is, they are not necessary parties, and were rightly omitted from the bill.

The conclusions reached upon this branch of the case are that the bill should have been filed by the complainants on behalf of themselves and all others who were interested with them in the subject-matter; that the attorney-general should have been joined with them, in which case the pleading would have been a bill and information, or the attorney-general should have been made a party defendant. The result is that the bill will have to be amended so as to make the complainants sue on behalf of themselves and the rest of the class who are interested with them, and the attorney-general will have to be made a defendant and brought into court by process before a decree can be pronounced.

The case will be disposed of on the merits at this time as between the parties to the record, and, if the attorney-general, after being brought in, should be satisfied that a right conclusion has been reached, he may file a formal answer and submit to the judgment of the court. If, however, he should file a litigious pleading against the defendant trustees, the case will be opened to afford him an opportunity to take proofs in addition to the testimony which is already in. In the event of this course being taken the view of the facts hereafter to be expressed will, of course, be put aside and the whole question will be considered open.

Coming now to the facts of the case, it appears that the plan of union services, so called, outlined by the donor, has been followed by the defendants. No Sunday school was ever held in the Cedar Grove church during Mr. Tulane's time, nor until four or five years ago, when Dr. Wykoff, the president of the board of trustees of the First Presbyterian Church of Princeton, consented to the use of the edifice for Sunday school purposes, without consulting the other trustees or receiving any authorization from them. The holding of Sunday school services in the church was not a part of the donor's plan.

It was shown that the trust fund, originally $5,000, had accumulated, and Mr. Howe, one of the trustees and secretary of the board, stated that the full income had not been used by the defendants to keep the church in order and to pay the various salaries and encourage the work of the church, because Mr. Tulane, after giving the fund, stated that he wished to pay all the expenses of carrying on the work, and did so for the eleven succeeding years, before he died.

The average attendance upon the services of the church in Mr. Tulane's time was from fifty to one hundred. It has gradually dwindled until during the last three or four years it has ranged from about five to twenty-five, occasionally going above the last number, the average being, perhaps, in the neighborhood of fifteen. Mr. Paul Martin, the secretary of the faculty of the Princeton Theological Seminary, was connected with the Cedar Grove church during the year 1905. He preached there steadily during the year on each Sunday when the pulpit was to be filled by the pastor of the First Presbyterian Church, and only found a congregation of six or seven people. He thereupon made a canvass of the vicinity to ascertain the religious beliefs and church affiliations of the people and found that they were almost universally connected with some church. He inaugurated some social gatherings to encourage interest in the church, but his efforts were unavailing. The trouble appears to have been with the plan, namely, that of union services, so called, which are services conducted by pastors of various denominations, neither the services nor the congregation at any time being distinctively of a denominational or sectarian character, as I understand it.

Mr. Martin says that this plan never succeeds as far as his knowledge extends. There is other testimony to the same effect, and I am satisfied this view is correct. It seems that there can be no effective organization for religious work of this kind, and that doubtless is the reason of the want of success of the union plan.

The complainants contend that the conditions require the continued execution of the trust upon the plan and according to the intentions of the donor, but, failing that, that the trust property and fund should be applied *cy pres*.

My judgment is inclined to be against the complainants upon the first proposition, for its seems to me that the prevailing conditions are such that the plan and intention of the donor is not being and cannot be efficiently and effectually carried out. But this question is not decided because of the power and discretion of the trustees in the premises as hereafter stated.

As to the second proposition: I think the doctrine of *cy pres* does not apply, because the donor by the terms of the trust has precluded its application. In this connection it should be remarked that the complainants do not point out in what way the trust property and fund can be applied *cy pres*. Admittedly, in a proper case, the doctrine obtains in this state.

In *MacKenzie* v. *Trustees of Presbytery, 67 N. J. Eq. (1 Robb.) 652,* it was held that a trust for public worship and instruction for the benefit of an indefinite number of persons according to Presbyterian faith and policy, with certain added provisions, appeared to be good as a charity, and that such a trust is enforceable in this state either exactly or under the doctrine of *cy pres* approximately, and Judge Green, speaking for the court of errors and appeals in that case (at *p. 673*), quoting from Chief-Justice Beasley in *Hesketh* v. *Murphy, 36 N. J. Eq. (9 Stew.) 304, 310,* said: "When a gift has been placed in the hands of a trustee to promote a charity, which, from the mutation of circumstances had become incapable of fulfillment, such gift was to be applied by the courts, exercising a purely judicial authority, to some cognate object." And again (at *p. 675*): "The sound rule now is, at least in America, that courts will not execute charitable trusts in a manner different from that in-

tended, unless the intent cannot in the original mode be literally carried out; that they will preserve the substance, although the mode be departed from, and that they will not presume or invent an intention which the testator or donor has not fairly indicated."

Now, upon the authority of these cases, it is perfectly apparent that if the particular trust created by the donor is no longer capable of fulfillment owing to the changed conditions existing, the property and fund would be applied *cy pres,* were it not for the fact that the donor himself in the deed of gift has provided what shall be done with reference to the trust estate in the event of the failure of the object of charity which he endeavored to promote.

Of course, the doctrine of *cy pres,* that is, the doctrine that a fund for charity, being impossible of application according to the intention of the donor, shall be applied, as nearly as may be, according to his intention, can have no existence when the donor himself provides for the application of the fund in the event of the failure of the charitable use to which he in the first instance directed that it should be devoted. In the deed under consideration Mr. Tulane provided that, upon failure of the trust, the property should go to meet certain expenses of the First Presbyterian Church of Princeton. Therefore, surely, if the trust has failed, the property must be applied as the donor directed, and not upon any theory of *cy pres.*

The crucial point in the case is the plenary discretion given to the defendants, the trustees, to authorize and decide when to discontinue the plan of holding the property for the use expressed in the trust deed, and their action under that power.

Let it be remembered that the language of the deed is:

"Whenever hereafter the use of said Chapel for the purposes aforesaid shall have been necessarily abandoned, or discontinued through the neglect of the people to attend upon the services; or through the failure of the several pastors to preach in said Chapel; or through the waste or destruction of said building; or whenever from any cause it shall seem to the said trustees, clearly expedient to discontinue the plan of holding the said property for such use, as aforesaid, they the said Trustees being the judges and fully authorized to decide such discontinuance, upon all or any cause whatever, then in such case of non-

user, abandonment or discontinuance, the said Trustees shall hold the said land and all buildings thereon, as the property of the said Trustees for the use of the said First Presbyterian Church and Congregation of Princeton, with full power to sell the same and convert it into money and to hold the money arising from the sale thereof, forever, in fee, for the use of the Board of Trustees of said First Presbyterian Church and Congregation of Princeton aforesaid, of which they are the Trustees, for meeting and defraying the contingent and ordinary expenses of said Church and Congregation."

As to the $5,000 trust fund given by Mr. Tulane to the trustees under the deed, at or about the time of the delivery of that instrument, it was provided by the donor, that whenever the church should have ceased to be used for preaching and holding religious services therein and should have been sold and abandoned for such use, ·then the $5,000 was to be held for the same use as the church and land, or the money arising from the sale thereof was to be held, namely, for defraying the contingent and ordinary ·expenses of the First Presbyterian Church and congregation of Princeton.

Where a power is given to trustees to do or not to do a particular thing at their discretion, the court has no jurisdiction to lay a command or prohibition upon them as to the exercise of that power, provided their conduct be *bona fide* and their determination is not influenced by improper motives. *2 Lew. Trusts *613, and note o.*

Where absolute discretion is given to trustees as to the exercise of a power, the court will not compel its exercise unless it is improperly or unreasonably exercised. *Tempest* v. *Lord Camoys, 21 Ch. Div. 571.* See, also, *Marquis of Camden* v. *Murray, 16 Ch. Div. 161.*

Where trustees had power to apply the income of a fund in their "uncontrolled and irresponsible discretion," the court, while expressing an opinion that the trustees were not acting judiciously, declined to interfere with their discretion, there being no proof of *mala fides. Tabor* v. *Brooks, 10 Ch. Div. 273.* See, also, *Gisborne* v. *Gisborne, 2 App. Cas. 300; Attorney-General* v. *Governors of Harrow School, 2 Ves. 551; Brophy* v. *Bellamy, L. R. 8 Ch. App. 798; Collins* v. *Vining, C. P. Coop. 472.*

Where in a trust deed for the satisfaction of debts a discretion is vested in the trustees to refuse the benefit of that deed to any

creditor, although his claim might be lawful, the court could not empower a master to ascertain who were entitled to the benefit of the deed. *Wain* v. *Earl of Egmont, 3 My. & K. 445.*

In *Cowley* v. *Hartstonge, 1 Dow. 361,* Lord Chancellor Eldon remarked (at *p. 378*) that if a testator clearly manifested his intention on the face of the will that his trustees should have certain discretion, the court would not control that discretion.

In *Talbot* v. *Marshfield, 2 Dr. & Sm. 285,* Vice-Chancellor Sir R. T. Kindersley said that the intention of the testator clearly was that if a certain exigency arose the trustees should, if they thought fit, in the exercise of their discretion, notwithstanding the gift in remainder, hand over the *corpus* of the fund to the persons entitled for life; and the court would not interfere with the honest exercise of such discretion.

Where a testator directed two trustees to apply certain rents, or such parts as they or he should in their or his discretion see fit, in the maintenance and education or advancement in life of his younger children, during the life of his wife, and one of the trustees having died, the court would not interfere with the discretion to be exercised by the surviving trustee. *Livesey* v. *Harding, 1 Tam. 460.*

In *Gisborne* v. *Gisborne, 2 App. Cas. 300,* Lord Cairns, speaking for the house of lords, said (at *p. 305*) : "The trustees are not merely to have discretion, but they are to have 'uncontrollable,' that is, uncontrolled, authority. Their discretion and authority, always supposing that there is no *mala fides* with regard to its exercise, is to be without any check or control from any superior tribunal."

*In re Lofthouse, an infant, 29 Ch. Div. 921,* Vice-Chancellor Bacon, referring to *Gisborne* v. *Gisborne, ubi supra,* remarked (at *p. 926*) : "There the trustees had reposed in them an 'uncontrollable authority,' and their lordships refused to interfere with that authority."

In *Marquis of Camden* v. *Murray, 16 Ch. Div. 161,* Vice-Chancellor Malins (at *p. 170*), speaking of the court's exercise of control over trustees, remarked : "In certain cases—not in all cases because if their discretion is absolutely uncontrollable, I should not interfere—that I have recently decided, after full investiga-

tion, in the case of *Tabor* v. *Brooks, 10 Ch. Div. 273,* where there was an absolute discretion in trustees; although they exercised their discretion in a manner most unsatisfactory and in a way I entirely disapproved of, yet I felt myself bound to come to the conclusion, on the authorities and principles of the court, that I could not control them where there was no *mala fides,* and where they were honestly exercising their power."

In this state the court of errors and appeals in *Read* v. *Patterson, 44 N. J. Eq. (17 Stew.) 211,* held: "Where a power is coupled with a trust or duty, a court of equity will enforce a proper and timely exercise of the power; but if it be given upon a trust to be exercised in the discretion or upon the judgment of the trustee, the court will not interfere with the trustee's discretion in executing the trust unless he has exercised his discretion *mala fide."* And cited with approval many English cases, among them *Livesey* v. *Harding, Brophy* v. *Bellamy, Tempest* v. *Lord Camoÿs, In re Lofthouse, ubi supra.*

This case is an appeal from the conscience of the trustees to the conscience of the court, and, assuming that the court, upon the facts, would be of the opinion that the complainants are entitled to the relief they pray, namely, that the defendants be enjoined and restrained from selling and conveying away any part or parcel of the Cedar Grove church property, and further, that they are entitled to have the trust property applied *cy pres,* still, the court would be powerless to grant such relief unless the defendants had acted *mala fides.* There is no proof of bad faith in this case. On the contrary, the trustees, all honorable and intelligent men, appear to have acted in a way entirely warranted by the facts, and while not obliged under the terms of the trust to give reasons for their action in that regard, they have given some of them, which may be succinctly stated as follows: That certain of the pastors who supply the pulpit at Cedar Grove have recommended the discontinuance of the religious services carried on under the plan by reason of existing conditions; that the community in the vicinity of the church has changed since its establishment and that none of the people for whom the trust was originally created are now living at Cedar Grove; that almost without exception the religious people there are connected with other churches;

that the services of recent years have been poorly attended; that the abandonment and sale of the church will not deprive the people of Cedar Grove of gospel privileges. They say that it seems to them to be their plain and clear duty to discontinue the services under the terms of the trust and plan of the donor. And in this I am inclined to agree with them, especially in view of the great falling off in the attendance upon the services, amounting, at times, at least, almost to an abandonment of the church as a place of religious worship. However, this question is not decided, as I before remarked, and the reason is that its decision was by the donor confided to the trustees who have made a *bona fide* exercise of their power in that regard. This being so, the court may not review their judgment in the premises.

The result is that as the case stands the prayer of the complainants must be denied. The amendment above mentioned will be directed to be made, and the attorney-general must be made a party defendant. After he appears and answers ultimate disposition will be made of the case as above indicated.

As this proceeding is in good faith and requires a construction of the trust instrument under which the property is held, it would appear to be a case for the allowance of costs and counsel fees to both parties under the authority of *Attorney-General* v. *Moore's Executors, 19 N. J. Eq. (4 C. E. Gr.) 503, 519.* I will hear counsel further on this question at any time before final decree.

Memorandum on application to settle decree.

WALKER, V. C.

This was a case concerning a trust arising under a deed. The opinion concluded thus, *supra:*

"As this proceeding is in good faith and requires a construction of the trust instrument under which the property is held, it would appear to be a case for the allowance of costs and counsel fees to both parties under the authority of *Attorney-General* v. *Moore's Executors, 19 N. J. Eq. (4 C. E. Gr.) 503, 519.* I will hear counsel further on this question at any time before final decree."

This question of the allowance of costs and counsel fees was not raised or argued, and now counsel for the defendant objects to their allowance on the ground that they are properly payable out of the estate only in case of contests under wills, but are not allowed in the case of contests under deeds.

The authority upon which I predicated the allowance is that of *Attorney-General* v. *Moore's Executors, supra,* in which case the court of errors and appeals (at *p. 519*) said:

"If reasonable grounds exist for coming into the court to obtain the construction of the instrument creating the trust, the practice is to allow the costs and expenses, as it respects all the parties, and as between attorney and client, out of the trust funds."

Although the court in *Attorney-General* v. *Moore's Executors* was dealing with a trust created by will, nevertheless, the award of costs and counsel fees to all parties was said to be the practice in cases where "reasonable grounds exist for coming into the court to obtain the construction of the *instrument* creating the trust." Now, if the court meant that that practice obtained only with reference to contests arising under wills I believe it would have so stated. But, the observation that the rule obtains in cases where the *"instrument* creating the trust" has to be construed, strikes me as a deliberate decision to the effect that the rule is not confined to *will* cases, as a *will* is only one instrument under which a trust may be created, and a *deed* is certainly another one. I am not prepared to believe that the court of errors and appeals meant to confine allowances in cases of the kind under consideration to trusts arising under wills, because if it did how easy it would have been to use the proper and apt expression "will" creating the trust instead of "instrument," a term which comprehends "deed" as well as "will."

In *Bouv. Dict. (Rawle's revision) 1064,* "Instrument" is thus defined:

"A document or writing which gives formal expression to a legal act or agreement. * * *

"It includes bills, bonds, conveyances, leases, mortgages, promissory notes, and wills."

I have not overlooked the fact that the court of errors and appeals in *Attorney-General* v. *Moore's Executors* cited as authority for allowances to both sides *1 Redf. Wills 493,* and *3 Dan. Ch. Pr. 1554.* (the paragraph number must be a mistake, and paragraph 1427, which concerns costs in will cases, must be intended). Nor have I overlooked the fact that the decision, so far as it extends to instruments other than wills, is probably *dictum,* as it was a will case which was under consideration. My interpretation of the court's decision, and, consequently my opinion, is, that the word used, namely *instrument,* was used in its usual and ordinary sense.

There is, in my judgment, a peculiar equity in this case entitling the complainants to costs out of the trust property. This was not a suit brought immediately upon a trust being created to resolve doubts and ambiguities upon the face of the trust instrument in order that the trust might be settled and applied, but was a case in which the trust had been executed for a period of more than thirty years, and then the trustees, under power conferred upon them, determined that conditions subsequent had happened which rendered the trust property no longer available, or at least no longer required, for the purposes of the original trust, and thereupon determined to sell such of the trust property as consisted of land and hold the proceeds, together with certain moneys donated, upon a certain other trust, of which the complainants were not the beneficiaries. To say that in such a case the original *cestuis que trust* must defend at the peril of costs, although they have reasonable ground for defending, seems to me to be untenable. At least I think that costs in such a case may, in the discretion of the court, be awarded out of the fund. I adhere to my original view and will allow costs to the complainants and a counsel fee of $350, payable out of the trust estate. Defendants' counsel does not ask for an allowance in the decree.