AUBREY H. MARTIN et al.

*v.*

CHARLES E. KIMBALL, trustee, et al.

[Decided February 2d, 1916.]

1. Where lands are conveyed in trust, with directions to pay the income to one for life, with remainder over, taxes on the land, including that which is unimproved, are payable from such income.

2. Where a will devised land in trust, with directions that the rent be paid to testatrix's husband for life and after his death to her children, there was no notional conversion of the property at her death, notwithstanding a provision of the will vesting in the trustees a discretionary power, thereafter exercised by them, to sell that part of the land which was unimproved.

3. A notional conversion of land will not be referred to a time anterior to the time when conversion is directed by the will.

4. The presumption of a notional conversion will not be indulged in where the will clearly shows testatrix's intention in respect thereto.

5. A provision of a will authorizing the trustees to advance to minor life tenants a portion of the principal bequeathed, whenever the trustees should deem it expedient in view of their "necessities, comfort or welfare," did not authorize an advance of $5,000 from the principal to the mother of the minors, where it did not appear but that the share of the income being received by her and her other resources were sufficient to properly support and educate the minors, and it appeared that an annual allowance of the amount requested would, in a few years, dissipate the money given to the minors.

*Mr. Alonzo Church* and *Mr. James R. Sloane,* of New York, for the complainants.

*Mr. Stuart A. Young, pro se,* and as guardian for Elizabeth Brown and Margaret Brown.

*Mr. William Byrd, pro se,* and as guardian for Julia K. Martin, Aubrey H. Martin, Jr., and Mary F. Martin.

*Mr. Corra N. Williams,* for the trustee.

STEVENS, V. C. ·

This is a bill based upon the provisions of the will of Mary T. Martin, a resident of Summit, who died in October, 1894. It seeks a decree requiring the trustee to pay to complainants certain sums of money which it is alleged have been wrongfully withheld because the will has been erroneously interpreted by the parties. It also asks that the court empower the trustee to pay certain sums of money out of the principal of the estate, under a discretionary power that might have been exercised by the original trustee, but can now be exercised only by the court itself.

The will was, as to some of its provisions, before this court in *Dillingham* v. *Martin,* *61 N. J. Eq. 276,* and was construed by Chancellor Magie, but not in the respects here considered.

The testatrix, after giving various legacies, provided as follows:

"*Sixth.* All the rest, residue and remainder of my estate of every name and nature and wheresoever the same may be situate, of which I may die seized or possessed or which at my death I may be entitled to, I give, devise and bequeath to my husband Archer N. Martin and Charles E. Kimball, to have and to hold the same to them or the survivor or successor of him or them or their or his heirs forever; but in trust nevertheless to and for the following uses and purposes, to wit: to convert the same into cash and invest and reinvest the same from time to time at their discretion or at the discretion of the survivor or successor of them, in such manner and in such securities or investments, *real or personal,* as to them or him may seem best and to take, collect and receive the *rents, issues,* interest, income, dividends and profits thereof and pay the same over to my said husband for and during his natural life to be used and employed by him wholly at his discretion for the benefit of himself and the comfort, education and support of my children."

She then makes a provision of considerable length designed to protect her property against her husband's creditors, and proceeds as follows:

"And I hereby grant to my said trustees the right and power to advance to my said husband, from time to time at his request, from the principal of said trust, such sums as they in the exercise of a liberal discretion may deem proper to advance to him."

"*Seventh.* I hereby empower my said husband to dispose of the trust fund mentioned and referred to in the foregoing sixth section or so much thereof as shall remain in the hands of said trustee at his death by his last will and testament in such manner as he shall deem best but in the event that he shall fail to exercise said power of disposition, I direct that then said trust fund be divided into equal shares, one for each of the children, I shall leave and one for the child or children as the case may be of any and every of my children who may then have died leaving child or children living at the time of the death of my said husband; and I empower the Trustee who shall survive my said husband to designate and set apart and invest and reinvest one of said shares for each of my surviving children and one for the child or children as the case may be of any deceased child or children of mine (a share for the child or children of each deceased child) and to pay over the *rents,* income, *issues* and profits of each share accordingly, to the person or persons for whom the same shall be so designated and set apart for the natural life of the said person or persons and at the death of said person or persons the share is to go to the next of kin of such person or persons and I give the same accordingly.

"And I hereby grant to said trustees and the survivor of them the broadest discretion as to the property or securities in which to make investment and I hereby authorize and empower them to advance a portion of the principal of the share to the person or persons for whom the same may be so set apart and designated whenever said Trustees or the survivor of them, shall deem it expedient in view of the necessities, comfort or welfare of such person or persons."

"*Eleventh.* I hereby grant to my executors and Trustees hereunder full power of sale of any and all my estate upon credit or for cash and I hereby empower them to execute such proper deeds, assignments or conveyances as shall be necessary or proper to enable them to execute such sale or sales, and I hereby further grant to them full power, authority and discretion to use any part of the principal of either or any of the funds herein granted to them *for the purpose of improving real estate devised* by me or for the purpose of maintaining the same in good condition and I hereby grant to my said trustees, right, power and discretion to change investments from time to time and to invest the funds submitted to their care in safe interest bearing or dividend paying securities or on bond and mortgage *or in improved real estate.*"

The husband of testatrix died in December, 1894—that is, within three months after testatrix died. Her son Aubrey, who

had, by codicil, been substituted for Mr. Kimball, acted as trustee until December, 1896, when he was replaced by Mr. Dillingham, who acted until October, 1909. Then Mr. Kimball was appointed, and is now acting.

The complainants make two contentions—*first,* that the taxes on real estate should have been paid out of the proceeds of the land sold and not out of income; *second,* that the proceeds of the sale of the unimproved real estate actually sold should have been apportioned between the life tenants and the remainderman on the theory of a notional conversion of the land into money immediately upon testatrix's death.

The yearly accounts filed with the surrogate of Union county by Mr. Dillingham show, first, a capital account and then a separate income account of moneys received and expended. The taxes therein appear to have been paid out of income, and this practice continued from 1896 to 1909 without objection by anyone. The net income alone, after making such payments, was distributed among the children. I presume that Mr. Kimball's practice was the same, but his accounts are not before me. On this it is contended, on behalf of the infant children of the life tenants, first, that the taxes were properly paid out of income, and secondly, that the life tenants are now, in any event, estopped by the allowance by the orphans court of the accounts stated in that way, from contending otherwise, on the principle that the matter is *res adjudicata.* It seems to me so plain that, under our decisions, the taxes are payable out of income that it is unnecessary to discuss the second question. *Holcomb* v. *Holcomb, 27 N. J. Eq. 473; 29 N. J. Eq. 597; Cadmus* v. *Combes, 37 N. J. Eq. 264; Brearley* v. *Molton, 62 N. J. Eq. 345; In re Morton, 74 N. J. Eq. 797.*

The contention that the proceeds of sales of real estate should be apportioned merits a more extended consideration.

Mrs. Martin appears to have been a woman of considerable means. Her personal estate was inventoried at $113,639. Her real estate may have been worth four or five hundred thousand dollars. The unsold portion is valued by Mr. Kimball at $280,-000. The property lies on the western slope of the hill northwest of and adjoining the built-up portions of Summit. It was,

no doubt, until recently, farm land, or land adapted to a gentleman's country residence. At the time of Mrs. Martin's death, at least ten houses had been built upon it, and the accounts of Mr. Dillingham show that he, properly or improperly, spent large sums in developing it, so as to make it suitable for residences of the better kind. The trustee has sold many lots at high prices and all but three of the houses. From the little evidence, gleaned from the accounts filed and from what Mr. Kimball says on the witness-stand, it is fairly inferable that at the time of Mrs. Martin's death, the land regarded as a country place may be said to have been improved and regarded as town lots, as far as unbuilt upon it may be said to have been unimproved.

Now, what the court is asked to decide is, that the unimproved lots actually sold should have been regarded as having been converted into money at the time of Mrs. Martin's death; and that so regarded, the price paid should have been treated as, in part, interest or income, and distributed as such.

The principle invoked is that which, under certain conditions, is applied to personal property and is thus stated in *1 Lew. Trusts 303:*

> "Where at the death of the testator, the property is not in the state in which it is directed to be, the tenant for life is, before the conversion, entitled, as the court has now decided, not to the actual produce, but to a reasonable fruit of the property from the death of the testator up to the time of the conversion, whether made in the course of the first year or subsequently. If the conversion has been postponed either through the fault of the trustee or because he could not convert sooner, that ought not to vary the respective rights of the life tenant and the remainderman."

A similar rule, in the case of unimproved real estate, has been adopted by the courts of Massachusetts and New York, where the direction to sell is imperative and the conversion not to be postponed. *Edwards* v. *Edwards,* 67 *N. E. Rep. 659; Lawrence* v. *Littlefield,* 109 *N. E. Rep. 612.* Whether this be the present English rule may be open to doubt. *In re Searle* (*1900*), *2 Ch. 829.*

In *Yates* v. *Yates,* 28 *Beav. 637,* a testator left unimproved real estate to trustees for the benefit of his wife with remainder

to others, but with absolute discretion to the trustees as to whether they should or should not sell. In the course of his judgment, the master of the rolls said: "The principle of the court I apprehend to be quite clear where a testator gives property to trustees, with an absolute trust for conversion and with a discretion as to the time at which the conversion shall take place, if from any cause whatever arising from the exercise of the discretion and judgment of the trustee the conversion is delayed, then the tenant for life is not to be prejudiced by that delay, but is to have the same benefit as- if the conversion had taken place within a reasonable time of the death of the testator which is usually fixed at twelve months from that period." This passage was criticised by Mr. Justice Kekewich in the case *In re Searles, supra,* so far as it applied the rule of notional conversion to cases in which the sale was not improperly postponed. The statement of the master of the rolls was, in fact, mere *dictum* as applied to such cases. What he actually decided was that as the will gave an absolute discretion to the trustees as to whether they would or would not sell at all, there was no conversion, notional or otherwise, until sale. It may, I think, be safely asserted that notional conversion will not be referred to a time anterior to the time when conversion is directed. If, in my will, I direct that my property shall not be sold until ten years *after* my death, it cannot be deemed converted as of the time of my death.

In the case in hand, the will gives the property to trustees in trust to convert the same into cash and invest and reinvest, from time to time, at their discretion. If the will stopped here I should have no hesitation in holding that immediate conversion was directed; but there are other clauses which negative the idea of such conversion. The will provides that the husband of testatrix and his co-trustee are to take and receive (*inter alia*) the rents, issues and profits of the property for and during the natural life of the husband. If testatrix intended her husband to enjoy the rents, that negatives the idea that she intends him to enjoy notional income. If she give him rents she cannot be deemed to contemplate a condition of the property in which there will be no rents. No court has held that he can have both.

But the testatrix goes further: she gives the rents to her children after her husband's—the first life tenant's—death. She, therefore, contemplates that they too may enjoy rents. In the eighth clause she gives her trustees full power, authority and discretion to use any part of the principal "for the purpose of improving the real estate devised by her or for the purpose of maintaining the same in good condition."

This direction negatives the idea that she intends an immediate conversion; especially an immediate conversion of her unimproved land, for the authority is not to improve real estate that might, under the authority contained in the sixth clause, be purchased as an investment, but to improve real estate devised "by me," and to maintain it in good condition.

How long property so improved might be kept and maintained I need not now consider. It is difficult to fix any limit short of the period of the life tenancies. The fact that she authorizes the trustees to invest the proceeds of the sale of her real estate in other real estate proves that she was not averse to investment in land. The cases of *Edwards* v. *Edwards* and *Lawrence* v. *Littlefield, supra,* were cases of land wholly unimproved, and cases, too, in which no authority was given to improve or to postpone the sale at the discretion of the trustees—in which, in the words of Chief-Justice Knowlton, the will did not "indicate an intention that the time for establishing the fund should be postponed." The case in hand more nearly resembles *Yates* v. *Yates* and *In re Searles, supra,* than it does those cases.

I do not see how, in a case circumstanced as this is, the improved and unimproved portions of the land can be, notionally, separated. As the testatrix has not separated them, I do not see how the court can. Putting it most strongly for the life tenants, the property is at least partially improved. No cases have been cited that show that notional conversion is dependent upon the quantity of rent received. Indeed, it is not shown by any evidence, outside of the meager indications to be obtained from looking over the accounts filed, that the property is not still one whole. There is scarcely anything to indicate that it may not have been one whole at testatrix's death.

The presumption of a notional conversion is only resorted to where the will does not speak. The will, of course, controls; and if it appear that what testatrix intended was that the life tenants should have rents only up to the time of conversion, and thereafter the income derived from the sale, the court must give effect to her intention. Here, whether we look only at the provisions of the will itself or read it in the light of the surrounding circumstances, it seems clear that as long as the property remains unconverted, the life tenants are to have such rent only as it yields, nothing more. And this is the practical construction put upon the will by the parties themselves for over twenty years. The administration of the estate has proceeded and the accounts have been audited and settled on this basis.

As the will is drawn, the construction thus placed upon it does not bear harshly upon the life tenants; for it authorizes the trustees to advance a portion of the principal to the children whenever the trustees shall deem it expedient, in view of their "necessities, comfort or welfare." Under this clause Mrs. Brown now asks an advance. She is receiving as her share of the income about $2,000 a year. She asks for an advance of $5,000. It was decided by Chancellor Magie, in the *Dillingham Case, supra,* that this part of the trust did not devolve upon the substituted trustee but must be executed by the court. It appears that Mrs. Brown has two daughters, ten and thirteen years old. Their education at present is being paid for by their father, who is living separate from his wife, and is, she says, financially embarrassed. While living together in or near Baltimore they lived in an expensive way. Mrs. Brown says her husband's family is prominent, socially, in Baltimore—that she has moved in the best society and expects her children to do likewise, and she thinks $5,000 would be a proper support.

If this sum should be taken year by year out of her and her children's share of the principal, it is apparent that in the course of fifteen or twenty years, there would be nothing left and the money given to the children would be dissipated. This court could not, in the proper execution of the trust, authorize the payment of such a sum. It would not be for her own welfare or that of her children as long as her husband is able or can be

2

made to educate his children, that the capital fund should be depleted for educational purposes. Nor can it be impaired to enable Mrs. Brown to keep up the style of living to which she has been accustomed. She says that she has had a nervous breakdown, caused, I suppose, by her marital troubles, and that she has spent about $3,000 in consequence; that she now owes about $600 on that account and is still under her physician's care. She says that she owes, in addition, $800 for money borrowed. The trustee has already advanced her $1,000. In view of all the circumstances, I think she may have a further allowance of $2,000, but this will not be a precedent for any future allowance, based merely on the ground that she has incurred other debts.