The late James S. Coward, by two separate trust indentures, created two trusts for the benefit of his daughter, Hattie C. Woodruff. As the successor trustee under these trusts, complainant seeks instructions of this court with respect to the more than twenty different problems confronting it in the discharge of its duties, concerning all of which it is in doubt.
Under the provisions of these trust indentures, dated March 30th, 1921, and August 20th, 1922, respectively, the settlor transferred to himself, as trustee for his said daughter, one hundred and three bonds, secured by real property mortgages, which, at the time of his death, had an aggregate face value of $2,869,000, and all of which, in the language of the trusts, he was to hold together with "all accrued interest thereon and interest which may hereafter accrue and become due thereon, upon the trust, to hold the same and keep the principal thereof invested in income-producing securities and to pay over to his said daughter, Hattie C. Woodruff, for her sole use and benefit all income, profits and interest for and during her natural life, said payments of income to be made either semi-annually or annually, as in the discretion of said trustee may be convenient and proper, each year during the life of said beneficiary."
Further provision was made in each of these trust indentures that:
"Upon the decease of said beneficiary, said trust shall cease and determine and said bonds and mortgages or any securities which may have been substituted therefor or the fund representing the principal of said trust and all income accruing thereon, thereafter shall revert to said James S. Coward, if he should then be living, and if he should have predeceased said beneficiary, then and in that event, upon the decease of *Page 446 
said beneficiary, the said trust fund and any income accruing thereon after her decease, shall fall in and become a part of the residuary estate of said James S. Coward and be disposed of according to his last will and testament, or in default of a will, according to the intestate laws of the place of his domicile."
On March 11th, 1923, the settlor died, leaving a will dated January 13th, 1923, which was thereafter on March 22d 1923, duly admitted to probate by the surrogate of the county of Hudson. Under its provisions he bequeathed $500,000 out of said trust funds to each of his said daughter's three children, Harriet W. Smith, Ruth W. Perry and Mary W. Hoff, now Mary W. Rice, three of the defendants herein, and the remainder of the said trust funds so becoming a part of his residuary estate to his son, John M. Coward, brother of Hattie C. Woodruff, who were his only surviving children.
On October 29th, 1923, John M. Coward succeeded his father as trustee under the said trusts and died on December 9th, 1925. By order of this court dated December 15th, 1926, he, in turn, was succeeded by complainant as trustee thereunder. In addition to those already mentioned, complainant has joined as defendants herein Minnie Coward individually and as administrator cumtestamento annexo of the estate of J. Mortimer Coward, Harry Moser and Minnie Coward, as successor trustees under the will of John M. Coward, and Miriam Coward Rice (hereinafter termed the ultimate remaindermen), to whom the remainder interest of the said John M. Coward in said trust funds passed upon his decease.
The settlor's entire estate, inclusive of said trust funds, as evalued for taxing purpose by the commissioner of internal revenue, less all debts, taxes, c., was the sum of $6,399,265.19 net, $2,869,800 of which, however, consisted of the mortgages comprising the said trusts created by him. As a result of the disastrous economic upheaval of 1929, followed by the unprecedented depression, the trust funds in particular suffered severely. A great many of the mortgagors defaulted in payment of both taxes and interest with the result that the trustee was constrained to foreclose some of its mortgages, *Page 447 
take possession, as mortgagee in possession, of other of the mortgaged premises, and permit the mortgagors, under rent assignments to it, to remain in possession of still others of said mortgaged premises, while certain other of the mortgaged premises were subjected to receiverships under the Stout act.P.L. 1933, special session, ch. 6 p. 1304. As a result the life beneficiary's income from the trusts shrunk from approximately $150,000 in 1929 and prior years to but $59,329.18 in 1936.
The more than twenty questions posed by the bill of complaint, petition, supplemental petition and further petition concerning which complainant here seeks the instructions of the court can readily be answered by the applying of such of the eight hereinafter considered principles, as may be applicable to the particular question presented for solution.
First: Should taxes accrued against mortgaged property prior to its acquisition by the trustee be paid by the latter out ofcorpus, income, or both? That such taxes are properly payable out of corpus alone was held in Trenton Trust and Safe DepositCo. v. Donnelly, 65 N.J. Eq. 119, and with that principle no quarrel is here found by any of the parties. Insistence is, however, made on behalf of the remaindermen that the application of that rule should be limited to those cases only where the trustee has foreclosed the mortgage with reasonable diligence. But, even if any such limited application of the rule were sanctionable by law, as to which no opinion need here be expressed, nevertheless there is here a total absence of evidence fairly indicative of lack of reasonable diligence on the part of the trustee in foreclosing any of the mortgages in question. Only upon the submission of such evidence could even the here urged limited application of the rule be rightfully invoked. A consideration of the plainest principles of equity and common justice rather leads to the view that the remedy of one aggrieved by unreasonable delay on the part of a trustee in foreclosing a mortgage is by way of interposing exceptions to the latter's account with a view of ultimately surcharging him, thus placing the ensuing loss upon him, rather than by way of seeking to have *Page 448 
engrafted upon the well settled rule the limited application here urged and thereby necessarily visiting such loss upon the life tenant, whom the evidence, as here, shows to be free of blame or responsibility for any delay.
Second: Should foreclosure costs upon property acquired by the trustee at a foreclosure sale be paid, in the first instance, out of corpus? In accordance with the rule recognized inParker v. Johnson, 37 N.J. Eq. 366, and Equitable Trust Co.
v. Swoboda, 113 N.J. Eq. 399, which is in nowise here questioned, this question must be answered in the affirmative.
Third: Should the trustee set up separate accounts in its books for each unit of property acquired by it through foreclosure and continue such accounts until the particular parcel of property is sold? Practical good sense, as well as the current of authority in and out of this state, requires that in instances where the trust fund consists of mortgages originally placed therein by the settlor or representing investments made by the trustee, that the trustee treat as separate units properties acquired by him through foreclosure; for no two such parcels are likely to be brought in on the same basis or to be sold under similar conditions. Hagan v. Platt, 48 N.J. Eq. 206; In reTuttle, 49 N.J. Eq. 259; Equitable Trust Co. v. Swoboda, supra;In re Chapal's Will, 269 N.Y. 464; 199 N.E. Rep. 762; Furniss v.Cruikshank, 230 N.Y. 495; 130 N.E. Rep. 625. Neither Outcalt
v. Appleby, 36 N.J. Eq. 73, nor cases of similar import, has any application to the case under consideration, because the unproductive property there involved constituted a part of the original trust estate; a distinction clearly recognized inParker v. Seeley, 56 N.J. Eq. 110. Hence, the answer to this question must also be in the affirmative.
Fourth: If the income of any separate unit of property be insufficient to meet the carrying charges thereof, should such deficiency be paid from the corpus or other income of the trust? In conformity with the rule enunciated in Trenton Trustand Safe Deposit Co. v. Donnelly, supra, followed with approval in Equitable Trust Co. v. Swoboda, supra, that *Page 449 
deficiency should be paid out of corpus. This is inconsistent with the holding in Tuttle's Case, supra, which case, however, was expressly disapproved by both of these later cases. The rule here adopted and followed in nowise conflicts with Outcalt v.Appleby, supra, or cases of like effect in all of which it will be observed that the trust originally consisted in whole or part of unproductive property, for the purpose of carrying which, the testator intended the utilization of the income from the rest of the trust. The distinction between such cases on the one hand andTrenton Trust and Safe Deposit Co. v. Donnelly, supra, andEquitable Trust Co. v. Swoboda, supra, on the other hand, where, as in the case at bar, the trust fund originally consisted of good income yielding properties is, indeed, most obvious.
Fifth: Should the trustee immediately foreclose all mortgages carried in the reserve account? On December 31st, 1935, thirty-four mortgages of the aggregate original principal sum of $994,700 were carried in the reserve account. The aggregate arrearage of interest and taxes, as of that date, on these mortgaged premises was the sum of $399,443.33 which undoubtedly has now mounted to nearly $500,000. As thus encumbered, the probability of these properties being liquidated without loss is so remote as to necessitate the prompt foreclosure of all such of these mortgages as are still held in the reserve account. As viewed in the light of the established facts, there appears to be nothing to justify any expectation that owner management of these properties will be more efficient than management by the trustee, nor its results any less disheartening to the life tenant. There being no lack of liquid funds available for that purpose, the duty of the complainant, as indicated in Equitable Trust Co. v.Swoboda, supra, is to promptly proceed with the foreclosure of these mortgages.
Sixth: Should the trustee liquidate all properties acquired at foreclosure without unreasonable delay? From the undisputed evidence it appears that the trustee on December 31st, 1935, carried thirty properties in its property account, representing an aggregate investment of $593,350. Arrears of *Page 450 
interest and taxes against these properties prior to the foreclosure of the mortgages thereon amounted to $143,927.37 and $57,639.63, respectively. Assuming that these unpaid taxes were capitalized, these encumbrances aggregate the sum of $201,567 or more than one-third of the aggregate sum of the original mortgages. To continue to carry these properties must be to continue to penalize the life tenant for the hoped for benefit of the remaindermen. Hence, the reasons hereinabove mentioned calling for the trustee's prompt foreclosure of the mortgages held in the reserve account dictate with equal, if not greater, emphasis its duty to proceed with the liquidation of these properties with reasonable dispatch and to thus expedite the apportionment of the apparently inevitable losses.
Seventh: Should the loss arising from the sale of foreclosed properties be apportioned between the life tenant and the remaindermen in the proportion that the debt due the life tenant bears to the amount due to corpus?
The evidence discloses the trustee's freedom from negligence or bad faith in the administration of its stewardship and that any ensuing losses are attributable solely to causes beyond its control or that of the life tenant or remaindermen. The trust does not exempt the remaindermen from the visitation of the possible perils and losses occasioned by failure of investment, nor should such, in fairness and justice, be thrown entirely upon the life tenant. The properties having been held for anticipated, but unattained, appreciation, the delay should be held to be as a joint venture between the life tenant and the remaindermen because such an investment situation involves the salvage of a security, which, obviously, is a security not for principal alone but income as well. Hence, the ensuing loss, as was said by Vice-Chancellor Reed in Trenton Safe Deposit and Trust Co. v.Donnelly, supra, should "be apportioned between the life tenant and the remaindermen in the proportion that the debt due the first bears to the amount which should come to the second, namely, the amount of the corpus of the estate; or, conversely, the amount realized shall be set apart to the remaindermen and *Page 451 
the life tenant in the proportion that the corpus bears to the unpaid interest due the life tenant." Recognition and approval of this rule is to be found in Hagan v. Platt, supra; Tuttle'sCase, supra; Equitable Trust Co. v. Swoboda, supra, and In reChapal's Will, supra.
 Eighth: Should the cost of rehabilitating properties owned by the trustee as distinguished from ordinary maintenance and repair costs be paid out of corpus? It follows as a result of the life tenant's duty to do his part in maintaining the value of the properties, that the cost of repairs, consisting of such changes in the structure as are designed and required merely to keep it intact and in its original operating condition, are properly chargeable to and should be paid out of income. On the other hand the life tenant ought not to be required to permit income due him to be used to enrich the remaindermen. 4 Bogert on Trusts andTrustees 2326 ¶ 803. If the changes to the property are of such a nature that they by increasing its utility and productivity, will add value to it, as turned over to the remaindermen, they properly should be paid for out of corpus.
There still remains for consideration the trustee's request for instructions as to whether it should buy in at foreclosure at the lowest possible price or at a price which it conceives to represent a reasonable price so as to avoid the possibility of having the first sale set aside. Ordinary experience indicates that, as a general rule, the trustee should bid a reasonable price, and thereby obviate any unnecessary delay or expense. By this instruction, however, it is not intended to preclude the trustee from exercising its discretion in each case, having due regard to the financial responsibility of the bondsman.
The answers to the foregoing queries are dispositive of all the mooted questions here submitted and the trustee is advised accordingly. *Page 452