Complainant-trustees seek instructions with respect to the administration of testamentary trusts and a construction of certain provisions of their testator's will and four codicils.
George G. Green died February 21st, 1925, a resident of Woodbury, Gloucester County. In proceedings for the assessment of state inheritance taxes the personal property of his estate was valued at $795,262.02 and the real property at $499,450; the gross value of the estate was determined to be $1,294,722.02, and its net value $1,094,778.28. After the administration of the estate by the executors, the residuary estate was turned over to the complainants as trustees.
When Mr. Green was still a young man he began to manufacture and sell proprietary medicines. He pioneered in nationally advertising such products, and soon amassed a fortune. Much of his income he invested in real estate. In *Page 481 
about the year 1870 he began to purchase land at Woodbury; thereon he erected a mansion house, a laboratory and factory for the preparation of his medicines, stores, office buildings, apartments, residences and manufacturing plants. He also bought farms and ranch lands in Ohio and Wyoming. He erected a large hotel in Pasadena, California, and purchased a tract of land nearby, plotted it, erected residences and sold the improved property.
Mr. Green executed his will November 14th, 1903. It is evident that at that time he planned to develop and sell his unimproved real estate and intended his testamentary trustees to continue so to do in the event of his death. In Division IV of his will he said: "* * * I further authorize and direct my said Trustee, if in its judgment such action will be for the best interests of my estate, to open streets upon, and lay out such of my lands as it may deem wise, in building lots, and make sales thereof * * *." November 4th, 1921, he entered into a contract with his son George G. Green, Jr., obligating the latter to improve, develop, promote and sell his real estate at Woodbury and in the State of California and, on August 3d 1922, he executed the fourth codicil to his will, confirming that contract and directing his trustee to observe and perform the requirements thereof.
The contract stipulated that it was to remain in force and bind the testator, his heirs, devisees, executors and trustees until all of the real estate of the testator had been developed and sold — "it being the intention of the party of the first part [the testator] to develop and improve and place upon the market the said land for the benefit of his estate." This unimproved real estate became a part of the testator's residuary estate and of the trust he created to carry out his fourth testamentary objective, thus stated in his will: "IV. To create a trust fund or estate, the income alone from which, to be paid to my said wife, my children and their children, until my youngest grandchild shall be twenty-one years of age, and my wife shall die."
The first two testamentary objects declared by the testator were: "I. To make provision for my wife. II. To provide for the occupancy of my homestead." In his will the testator *Page 482 
gave his wife $25,000 (increased to $50,000 by the second codicil) all of the furniture in his residence and his horses, carriages and automobiles; the testator also gave his wife, for her life or widowhood, a specified proportion of the annual net income from his residuary estate. Mr. Green was obviously proud of his mansion house and the position of his family in the community. To implement his second objective he created a trust: In Division II of his will he devised his homestead property to his trustee, in trust to permit his wife, his children and his grandchildren to occupy it upon payment of only $1,000 annually, to be applied toward payment of taxes and upkeep.
A second trust, a trust of the residuary estate, was created in Division IV of decedent's will. It was modified by the third clause of the second codicil and the fourth clause of the third codicil. The purpose of this trust, the testator declared, was: To distribute the net income from the residuary estate to his widow and his children in the manner and in the proportions set forth in the will; to distribute the corpus of the trust to such of his next of kin as should be living upon the death of the survivor of his widow and his children, and the attainment of the age of twenty-one years by his youngest grandchild.
The testator seems not to have conceived of the possibility of any serious depression in the real estate market at Woodbury. In section IV of his will, he authorized and directed his trustees to take charge of and manage his real estate and to keep it in as productive a state as possible; he authorized them to sell all or any part thereof at public or private sale; he especially enjoined them "to use extreme good care and judgment," and not to sell any of his real estate, which was income producing, or which from its advantage or situation was likely to be productive of income or increase in value, "but to only dispose of those properties which are not income producing and are a burden to the estate, * * *."
In the face of the depression which began a few years after the death of the testator, the trustees did not deem it wise to attempt to develop the testator's unimproved lands, and there was no market for the sale of such lands. Consequently, the *Page 483 
unimproved realty was carried by the trustees at a loss and, to pay taxes and to keep it in a condition suitable for sale, the trustees have taken moneys from the corpus of the residuary trust. Nor, when the trustees were empowered by the beneficiaries to sell the homestead property, could it be sold. The latter property consisted of approximately eight acres of land in the City of Woodbury upon which the testator had erected, in about the year 1870, a thirty-four-room mansion, a carriage house with living quarters, a large greenhouse and other buildings; the grounds were laid out as a park.
Following the death of the testator, his widow and his daughter Lotta G. Gratton elected to occupy the homestead as permitted by the will, and they continued to live there until October 1st, 1932. On that date they vacated the homestead and the widow and children joined in requesting the trustees to sell the property. The widow and Mrs. Gratton made one payment of $1,000 to the trustees. No additional moneys were collected because the other life beneficiaries of the residuary trust waived payment. Not only did they do this but they affirmatively directed the trustees to pay taxes and other maintenance costs of the property from income of the residuary trust. This the trustees did until October 1st, 1932, when the property was vacated. Later, a part of the carriage-house was rented and that rent was applied toward the cost of maintenance. The remaining cost of maintenance and taxes was paid out of the residuary estate and withheld from income paid to income beneficiaries.
The first intermediate account of the trustees was approved by decree of the Gloucester County Orphans Court. Two items were, however, reserved therein for allocation by this court to principal or to income. These items represent the expenditures made by the trustees to maintain the homestead property and the unimproved and non-income-producing real estate. Some of these expenditures were tentatively charged by the trustees to income and some to corpus. It may be here noted that, although the cost of maintenance of real estate has exceeded income from that source, the trustees have collected $553,476.32 in income from estate personalty. Since final hearing was had, I am now advised by counsel, the homestead *Page 484 
property has been sold. Until sale is made of the unimproved realty, taxes and any expense of maintenance will continue.
Complainants submit three questions for determination: (1) Should the cost of maintenance of the homestead and of the unimproved and non-income-producing realty be paid out of income or corpus? (2) Should any or all of the real estate be sold for such amount as can be obtained therefor under existing conditions? (3) Should the monthly compensation which the testator contracted to pay to his son George G. Green, Jr., be taken from income or principal?
The controversy in this cause is between certain life beneficiaries and those who will take in remainder. The life beneficiaries argue that the testator's will, his contract and his several codicils demonstrate an intention that the cost of maintaining unimproved real estate, including taxes, should be paid from the corpus of the residuary trust. Some maintain that the taxes and the cost of repairs and maintenance of the homestead property until sale, less the amount received from the widow and Mrs. Gratton and from renting a part of the carriage-house, should likewise be paid from corpus. The remaindermen contend, generally speaking, that all the expense of maintenance of the homestead property and of the unimproved real estate should be paid from income.
In New Jersey the general rule is that while unimproved and non-income-producing realty of a testamentary trust remains unconverted, all of the ordinary taxes and expenses of maintenance are to be paid out of the income derived from the balance of the estate. Outcalt v. Appleby (Court ofChancery), 36 N.J. Eq. 73; Brearley v. Molten (Court ofChancery), 62 N.J. Eq. 345; 50 Atl. Rep. 317; Martin v.Kimball, 86 N.J. Eq. 10; 96 Atl. Rep. 565; affirmed, 86 N.J. Eq. 432; 99 Atl. Rep. 1070. This rule, of course, operates only in the absence of an expressed intent of the testator to the contrary. Stephens' Executors v. Milnor (Court ofChancery), 24 N.J. Eq. 358. And, where the testator has specifically directed that "net" income be paid to life beneficiaries, "after" payment of taxes, insurance, repairs and necessary expenses, a deficiency in income to pay *Page 485 
those expenses can not be met by payment from corpus. FirstNational Bank of Toms River v. Levy (Court of Chancery),123 N.J. Eq. 21; 195 Atl. Rep. 820.
In applying legal rules to the evidence and in adjudging the questions submitted, regard must be had to the circumstance that two separate and distinct trusts were created by the testator. The establishment of two trusts is implicit in the testator's statement of his testamentary objectives; the homestead was devised to his trustees under Division II of his will, while a separate gift of the residuary estate was made under Division IV; the interests of the beneficiaries of the two trusts are not of the same legal character and rights of the widow differ in the case of each trust; income from the trusts is not to be paid to the same parties; the duration of the two trusts is not the same; the ultimate destination of the corpus of the two trusts is not the same; the two trusts differ with respect to the powers of the trustees; and, the privilege of occupancy of the homestead property distinguishes the homestead trust from the residuary trust. The fact that two separate trusts were created is important for, when a testator separates his property into two or more trusts and makes provision for the disposition of the income from and the corpus of each trust to different persons and in different proportions, a deficit resulting from the administration of one of the trust estates cannot be charged to a surplus resulting from the administration of the other. StamfordCo. v. Mack, 91 Conn. 620; 101 Atl. Rep. 235; In reLichtenberg's Estate, 171 N.Y. Supp. 570, 572.
The intention of Mr. Green with respect to payment of taxes and ordinary maintenance expenses on the homestead property is clearly indicated in his will and the several codicils. He hoped that his wife, his children and his grandchildren would occupy the homestead until such time as his youngest grandchild arrived at legal majority. He knew the approximate amount which would be necessary to maintain the homestead in a reasonably habitable condition and to pay the taxes. Nevertheless, he stipulated that so long as his wife, children or grandchildren should occupy the homestead they should be required to pay only $1,000 *Page 486 
annually toward such taxes and repairs. The testator must also have known or conceived of the possibility that $1,000 a year would not be sufficient to pay taxes and make repairs, for the only property in the homestead trust was the homestead and it would be productive of no other income so long as it was occupied by the widow, the children or the grandchildren. Even if the widow and the children chose not to occupy the homestead and it was rented, the income (in excess of $1,000 per year) could not be applied to payment of taxes or the cost of maintenance; the testator specifically directed that such rent be distributed among his children. From what source then did the testator intend that his trustees take the moneys necessary to make up any deficiency? Obviously, until the property could be sold, from thecorpus of his residuary estate. In codicil three he provided that, at any time after his decease, his wife if still his widow, and his then surviving children could request the trustees to sell the premises. All moneys realized, the testator directed, were to "be and become a part of the principal of the trust fund and estate provided for in Section IV * * *."
The program of the testator with respect to the homestead property was predicated upon his stipulation that those of his family who exercised the privilege of occupancy should pay $1,000 annually. When, in 1927, the income beneficiaries agreed to waive this payment and empowered and directed the trustees to pay taxes, insurance, repairs and other general maintenance expenses from the income of the residuary trust, the trustees did not require further annual payments from the widow and Mrs. Gratton, and made the necessary expenditures from income. On October 1st, 1932, Mrs. Green and Mrs. Gratton vacated the property and, as an advantageous sale could not be made the trustees continued to pay the cost of general maintenance out of funds in the residuary estate. From and after that date, however, they charged these expenditures against the residuary trust corpus, first crediting moneys received from rent of the carriage-house.
I shall advise that the general cost of maintenance of the homestead property from the death of the testator until February *Page 487 
10th, 1927, including payment of taxes, be charged against and paid out of the corpus of the residuary estate after credit given for $1,000 paid by the widow and Mrs. Gratton; that the general cost of maintenance of the homestead from February 10th, 1927, until October 1st, 1932, including payment of taxes, be charged against and paid out of net income from the residuary trust; and that, from October 1st, 1932, until sale and conveyance of the homestead, the general cost of maintenance, including payment of taxes, be charged to and paid out ofcorpus of the residuary trust, after credit given for rents received from renting the carriage-house.
The intention of the testator with respect to payment of taxes and ordinary expenses on unimproved and non-productive real estate of the residuary estate was, I am persuaded, expressed even more clearly by the testator. He intended them to be paid from income. Certain counsel have argued that the residuary estate should be considered as of two parts, one consisting of the personal property and the income-producing real estate, and the other of the unimproved and non-income-producing real estate. I can find no such intent expressed by the testator in his will or codicils. His fourth testamentary purpose was to create a trust fund or estate, not two trust funds or estates. To create this trust the testator gave to his trustee "All the rest, residue and remainder of my Estate, real, personal and mixed, * * *." It is true that the testator planned for the possible laying out of streets, the division of his unimproved lands into lots, the building of houses thereon and the sale of lots and improved properties, but nowhere in the will or codicils can I find any indication of an intent that taxes and the cost of maintenance of unimproved real estate be paid from corpus, or temporarily fromcorpus with reimbursement upon sale of such real estate. In fact, there are unmistakable expressions to the contrary. In Division IV of the will the trustee is directed "to invest, re-invest, and keep invested all such personalty, and the moneys that shall come in from said real and personal estates, except such as is needed in carrying out and executing the provisions of this trust * * *." *Page 488 
Counsel for certain remaindermen point to the latter words of this clause and argue that the testator intended all taxes and maintenance costs on unimproved and non-income-producing real estate to be taken from the corpus of the residuary trust. It is of investing funds that the testator is speaking; he had already provided for payment of "taxes, insurance and repairs" out of income; then, recognizing that funds would be needed if
lands were to be plotted, streets opened, and houses constructed, he excepted from investment the money necessary to carry out and execute these possible purposes of the trust. The testator, in authorizing the development of his lands, provided that "all moneys realized from such sale and sales, if made, shall be and become a part of the principal" of the "trust fund and estate." In the contract the testator made with his son respecting real estate development, he provided that no more than five houses should be "in process of construction, unsold or contracted for at any one time," and that the proceeds of sales of real estate should be immediately accounted for by George G. Green, Jr., "after deducting the said salary and commissions and such expenses of development, advertising and sales as shall be agreed upon between the parties hereto. It being understood that the building of houses is not intended solely for speculative purposes, but particularly for starting general improvement on vacant land and to encourage other building by purchasers of lots."
"When ascertainable, the intention of the testator is controlling in determining whether expenses and charges are to be deducted from the income or from the capital of the trust estate or from other funds of the testator's estate which are not embraced in the trust in question or which are not yet set apart as the principal of another trust in the residue." 69 C.J.,Wills, ¶ 1893.
Most significant are the words of the testator with respect to payment of income to his beneficiaries. The testator said: "After having paid the taxes, insurance, and repairs, and necessary expenses of executing this trust, I authorize and direct my said Trustee, to pay to my said wife, and to each of my said children upon him or her reaching the age of *Page 489 
twenty-one years, * * * and each and every year thereafter, said Trustee shall pay to my said wife and said child such proportionate share of the net annual income of the then current year * * *." (Italics mine.) The testator later in his will provided for payment of income to the issue of deceased beneficiaries; again he used the words "net annual income."
Still later the testator provided for payment of income to his children surviving the death of his wife; the words he used were: "net income of such trust estate and fund, be paid," c. In stating his fourth testamentary object he said that "incomealone" from the residuary trust was to be paid to his wife, his children and his grandchildren and, in his third codicil, he reiterates his statement that "net annual income" is to be paid life beneficiaries "after" payment of taxes, insurance and repairs. (Italics mine.)
The testator's expressed intent was identical with that which would be presumed in the absence of an expression of intent by him. "Where the income or use of real property is given, the presumption is that the net income or profit is meant and that the beneficiary must pay out of the gross receipts all expenses, taxes, and charges against the property." 69 C.J., Wills, ¶1419; 4 Bogert, Trusts Trustees, § 803; 2 Scott, Trusts, §2334. In Restatement of the Law of Trusts, § 233, the rule is thus stated: "(1) Except as otherwise provided by the terms of the trust, if property is held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary, (a) the former beneficiary is entitled to, and only to, the net income during such period, and (b) the latter beneficiary is entitled to the principal on the expiration of such period. (2) the net income is ascertained by subtracting expenditures allocable to income from receipts allocable to income."
The New Jersey authorities are in accord. In Stephens'Executors v. Milnor, supra, the court directed that taxes, repairs and other expenses reasonably necessary to maintain a residence be charged to income and not to corpus. In Outcalt
v. Appleby, supra, the court made point of the fact *Page 490 
that the testator in speaking of his residuary estate, treated it as a whole. The court remarked: "He gives to the life-tenants the net rents, issues and profits thereof, after payment of all the necessary and proper charges and expenses." In Brearley v.Molten, supra, the court pointed out that the whole estate, pending sale, was one fund in the hands of the executrix, and that it was her duty to pay taxes out of income. In Brown v.Brown, 72 N.J. Eq. 667; 65 Atl. Rep. 739, Vice-Chancellor Garrison, citing Holcombe v. Holcombe, 29 N.J. Eq. 597, and other cases, held that as the residuary estate had not been divided by the testator and was being held by the trustees awaiting a favorable opportunity to convert it into divisible property, "it must be dealt with as a whole * * * and the ordinary taxes and expenses of upkeep are to be paid out of the income derived from the estate." In Morton's Case (PrerogativeCourt), 74 N.J. Eq. 797; 70 Atl. Rep. 680, the Ordinary held that the life tenant was bound to pay taxes on unimproved property from the income derived from revenue producing property. The fact was emphasized that the will established a trust with respect to "net" income from real estate. In Martin v.Kimball, supra, the court below said: "It seems to me so plain that, under our decisions, the taxes are payable out of income that it is unnecessary to discuss the second question." In Ash
v. Ash (Court of Chancery), 126 N.J. Eq. 531; 10 Atl. Rep.
2d 150, the facts were remarkably similar to those in the instant case. The testator there devised his entire residuary estate to his trustees in trust to pay the "net income" to his wife for life with remainder over. The testator also directed his trustees "to manage, lease, repair, control and finance" his real estate. He expressed the wish that his trustees do not "feel hurried in disposing of the same, * * * until they feel it is to the best advantage of my estate * * *." Vice-Chancellor Berry held that insurance premiums were payable out of income, and added that such a finding was in accord with the intention of the testator as expressed in his direction that the "net income" be paid the equitable life tenant. The Vice-Chancellor also said: "In view of this intent, no distinction between income producing and non-income *Page 491 
producing real estate should be made." In First National Bank ofToms River v. Levy, supra, the same Vice-Chancellor pointed out that by the language of the will before him certain annual payments were definitely limited to "net income." He held that a deficiency in income might not be made up from corpus.
In the instant case the trustees suggest, and the adult parties contend, that the decision in Martin v. Kimball, supra, and cases of like import, are not dispositive of the present question. They rely upon certain decisions of other states, and the New Jersey cases of Hudson County National Bank v.Woodruff, 122 N.J. Eq. 444; 194 Atl. Rep. 266; Hudson CountyNational Bank v. Woodruff, 123 N.J. Eq. 585; 199 Atl. Rep. 399;Equitable Trust Co. v. Swoboda, 113 N.J. Eq. 399;167 Atl. Rep. 525, and Trenton Trust and Safe Deposit Co. v. Donnelly,65 N.J. Eq. 119; 55 Atl. Rep. 92. An examination of these New Jersey authorities will reveal that the decisions therein did not overrule the precedents I have cited and commented upon. The court in each instance distinguished the case before it from such cases as Outcalt v. Appleby and Martin v. Kimball.
For about fifteen years the trustees have paid taxes on unimproved and non-income-producing real estate and the costs of maintenance out of income from other assets of the residuary trust. In view of my conclusion with respect to the expressed intention of the testator and in consonance with established rules of law, I shall advise a decree that all taxes and ordinary maintenance charges on the unimproved and non-income-producing real estate of the residuary trust be charged to and paid out of the income from that trust.
The trustees seek advice as to "whether the remaining parcels of real estate should be presently sacrificed for such price as can be obtained for them in order to carry out the testator's paramount intention for the maintenance of his family." The widow has died since the death of the testator. The children of the testator also attribute to him a predominate purpose to provide well for his wife and for them. Implicit in this suggestion of the trustees and the children is the argument that this court may and should take money *Page 492 
from the testator's grandchildren to presently benefit his children. But the testator specifically declared that he purposed to create a trust of his residuary estate, the "income alone" from which was to be paid to his wife, his children "and their children, until my youngest grandchild shall be twenty-one years of age." Also the testator, shortly before his death, set up a trust of $100,000, the income of which was to go to his children and, by the second codicil to his will he made a cash bequest to his wife of $50,000. May we assume that the testator did not consider these gifts sufficient, when added to his other gifts to these beneficiaries, to properly maintain them? If, indeed, the testator had one predominating idea when he was executing his will and codicils it would seem not to have been that suggested but to have grown out of his pride in his position and the position of his family in the Woodbury community and to have been expressed in his testamentary instruments where he planned to perpetuate his name and the standing of his family far into the future.
"It is the duty of the court to construe a will as written, and we may not surmise or guess what a testator would have done had he foreseen what would happen after his death, and then try to give effect to his supposed intentions." * * * "If the language is not ambiguous, and the intention is signified by apt words and phraseology, there is no room for construction. It is not proper for the court first to determine what the will ought to be, and then exercise its ingenuity in producing such a result." "Courts are not at liberty, because an event has happened which the testator has not provided for, to disregard the ordinary rules of construction that words must be read according to their natural and reasonable meaning, and inject into the will the provisions which the testator would probably have made had he contemplated the happening of the contingency." Vice-Chancellor Berry inFirst National Bank of Toms River v. Levy, supra.
The trustees have express power to sell real estate and the testator, obviously, had full confidence in the wisdom and judgment of his son, George G. Green, Jr. To his judgment and that of his co-trustee the testator entrusted the management and the future of the trust. The instant question *Page 493 
invokes the business judgment of the court; it is the honest and best judgment of the trustees which the testator directed and expected to function. Absent a showing of abuse, equity will not undertake to control testamentary trustees in the exercise of discretionary powers. Larkin v. Wikoff, 75 N.J. Eq. 462;72 Atl. Rep. 98; affirmed, 77 N.J. Eq. 589; 78 Atl. Rep. 1134;McFerran v. Paterson National Bank (Court of Chancery),125 N.J. Eq. 456; 6 Atl. Rep. 2d 403; Douglas v. Wm. McKinleyMemorial Hospital (Court of Chancery) (unreported, Docket 116-561).
The allocation of charges representing payments made to George G. Green, Jr., under the written contract was also reserved by the Gloucester County Orphans Court for the opinion of this court. All counsel seem to be agreed that payments made to George G. Green, Jr., should be charged against and paid from thecorpus of the residuary estate. With this I too agree. The testator made the contract binding upon his trustees and, by a codicil, instructed them to fulfill it. George G. Green, Jr., under its terms, obligated himself to give his entire time, if necessary, to the management, operation, development and sale of the testator's real estate. Net proceeds of any sale become a part of the capital of the residuary estate. Whether payments made under the contract be considered as a continuing obligation of the testator or as a gift in the nature of a legacy paid in installments, they are properly chargeable to and deductible from the corpus of decedent's residuary estate.
In the matter of items of charge and discharge, I have refrained from stating figures; the evidence is confusing in this regard. Counsel should be able to readily stipulate the correct figures if it is deemed necessary or expedient to have them placed in the decree to be advised. *Page 494